No. 23-11683
(consolidated with Nos. 23-11684 and 23-11685)

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES SUGAR CORPORATION,

OKEELANTA CORPORATION, and

SUGAR CANE GROWERS COOPERATIVE OF FLORIDA

*Plaintiffs-Appellants*,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Florida
21-cv-81505 (Hon. Donald M. Middlebrooks)

**INITIAL BRIEF OF PLAINTIFF-APPELLANT**

**SUGAR CANE GROWERS COOPERATIVE OF FLORIDA**

Gary V. Perko
Gary K. Hunter
Mohammad O. Jazil
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690

Counsel for Plaintiff-Appellant
Sugar Cane Growers Cooperative of
Florida

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

Per Rule 26.1 and Circuit Rule 26.1, Plaintiff-Appellant Sugar Cane Growers Cooperative of Florida certifies that the following have an interest in the outcome of this appeal:

- Bishop, Timothy S. (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

- Booth, Colonel James L. (Defendant-Appellee)

- Brabender, Allen M. (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

- Captains for Clean Water, Inc. (Amicus in District Court)

- Carlton Fields, P.A. (Counsel for Plaintiff-Appellant Okeelanta Corp.)

- Carpenter, Elizabeth Fata (Counsel for Amici in District Court)

- Clement & Murphy, PLLC (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

- Clement, Paul D. (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

- Coglianese, Matthew Patrick (Counsel for Plaintiff-Appellant Okeelanta Corp.)

- Connor, Michael L. (Defendant-Appellee)

- Dykema, Peter Kryn (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

- Everglades Foundation, Inc. (Amicus in District Court)

- Feeley, Matthew J. (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

- Florida Bay Forever, Inc. (Amicus in District Court)

- Florida Fruit & Vegetable Association (Amicus in District Court)

- Florida Farm Bureau Federation (Amicus in District Court)

- Florida Keys Fishing Guides Association, Inc. (Amicus in District Court)

- Glass, Robert C. (Counsel for Amicus South Florida Water Management District)

- Gunster, Yoakley & Stewart P.A. (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

- Holtzman Vogel Baran Torchinsky & Josefiak, PLLC (Counsel for Plaintiff-Appellant Sugar Cane Growers Cooperative of Florida)

- Hunter, Gary K. (Counsel for Plaintiff-Appellant Sugar Cane Growers Cooperative of Florida)

- Interlandi, Lisa (Counsel for Amici in District Court)

- Islamorada Chamber of Commerce, Inc. (Amicus in District Court)

- Jazil, Mohammed O. (Counsel for Plaintiff-Appellant Sugar Cane Growers Cooperative of Florida)

- Jeffries, Arielle Mourrain (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

- Karp, David A. (Counsel for Plaintiff-Appellant Okeelanta Corp.)

- Kelly, Colonel Andrew D. (Defendant-Appellee)

- Kupfer, Avi M. (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

- Lawrence, Andrew C. (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

- Lomonico, Julia (Counsel for Amicus South Florida Water Management District)

- Madden, Deborah K. (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

- Matthewman, William (U.S. Magistrate Judge, Southern District of Florida)

- Mayer Brown LLP (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

- McAliley, T. Neal (Counsel for Plaintiff-Appellant Okeelanta Corp.)

- Middlebrooks, Donald M. (U.S. District Judge, Southern District of Florida)

- Munson, Gregory M. (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

- Okeelanta Corporation (Plaintiff-Appellant)

- Perko, Gary V. (Counsel for Plaintiff-Appellant Sugar Cane Growers Cooperative of Florida)

- Phillips, Luna E. (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

- Pinkham, James A. (Defendant-Appellee)

- Samson, A. Ansley (Counsel for Amici in District Court)

- Sanibel-Captiva Conservation Foundation, Inc. (Amicus in District Court)

- Sanibel-Captiva Islands Chamber of Commerce, Inc. (Amicus in District Court)

- Scala-Olympio, Laura E. (Counsel for Joint Amicus, the Florida Fruit & Vegetable Association and Florida Farm Bureau Federation)

- South Florida Water Management District (Amicus in District Court)

- Spellmon, Lt. Gen. Scott A. (Defendant-Appellee)

- Sugar Cane Growers Cooperative of Florida (Plaintiff-Appellant)

- Sullivan, Sally J. (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

- Throckmorton, Charles (Counsel for Plaintiff-Appellant Okeelanta Corp.)

- U.S. Army Corps of Engineers (Defendant-Appellee)

- U.S. Attorney's Office, Southern District of Florida (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

- U.S. Department of Justice, Environment and Natural Resource Division (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

- U.S. Sugar Corporation (Plaintiff-Appellant)

- Wormuth, Christine E. (Defendant-Appellant)

\*   \*   \*

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Plaintiff-Appellant Sugar Cane Growers Cooperative of Florida discloses no parent corporation that owns 10% or more of its stock.

*/s/ Gary V. Perko*
Gary V. Perko

**STATEMENT REGARDING ORAL ARGUMENT**

This appeal involves the interpretation of a statute, the Water Resources Development Act of 2000 ("WRDA 2000"), that authorized the Comprehensive Everglades Restoration Plan ("CERP"). CERP, in turn, has a significant effect on agricultural and urban water supplies throughout South Florida. As the district court recognized below, "[t]he facts of this case can be difficult to get through" with "countless acronyms," "obscure statutes and regulations," and "thousands of pages of administrative record with technical language, written mostly by scientists and engineers." Order, at 2. Appellant, Sugar Cane Growers Cooperative of Florida ("Cooperative"), asks for oral argument to assist this Court with the prompt resolution of this case and to answer questions concerning the statute and record at issue.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT.................................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ..................................... i

TABLE OF CONTENTS ................................................................................ ii

TABLE OF CITATIONS ............................................................................. iv

STATEMENT REGARDING ADOPTION OF......................................... 1

BRIEFS OF OTHER PARTIES ................................................................. 1

JURISDITIONAL STATEMENT................................................................ 1

STATEMENT OF THE ISSUES ............................................................... 1

INTRODUCTION............................................................................................ 2

STATEMENT OF THE CASE ..................................................................... 4

    A.  Lake Okeechobee and the CS&F Project.................................... 4

    B.  Lake Okeechobee Regulation Schedules ............................... 5

    C.  The Water Resources Development Act of 2000 ............................ 6

    D.  The Corps' Programmatic Regulations........................................ 7

    E.  The EAA Project.............................................................................. 9

    F.  The proceedings below. ............................................................ 11

STANDARD OF REVIEW........................................................................... 13

SUMMARY OF ARGUMENT ..................................................................... 14

ARGUMENT ................................................................................................... 14

I.    In upholding the Corps' application of the Savings Clause, the district court failed to give proper effect to the plain language of the WRDA 2000 and the Corps' Programmatic Regulations. ...................................... 14

A.    The Savings Clause furthers CERP's objective to provide water supply by assuring that CERP projects will not eliminate existing legal sources of water. ...................................................................................................... 15

B.    The district court effectively rewrote the Saving Clause and Programmatic Regulations by allowing the Corps to substitute LORS 2008 for the pre-CERP baseline.................................................................. 17

CONCLUSION ............................................................................................................. 19

CERTIFICATE OF COMPLIANCE .......................................................................... 21

CERTIFICATE OF SERVICE ..................................................................................... 21

# TABLE OF CITATIONS

**Cases**                                                                                      **Page(s)**

*Albritton v. Cagle's Inc.,*
    508 F.3d 1012 (11th Cir. 2007) ................................................................................ 19

*Chevron, U.S.A., Inc. v. NRDC, Inc.,*
    467 U.S. 837 (1984) ................................................................................................ 15

*Cowart v. Nicklos Drilling Co.,*
    505 U.S. 469 (1992) ................................................................................................ 14

*Dotson v. United States,*
    30 F.4th 1259 (11th Cir. 2022) ............................................................................... 15

*Friends of the Everglades v. S. Fla. Water Mgmt. Dist.,*
    570 F.3d 1210 (11th Cir. 2009) ............................................................................... 19

*K Mart Corp. v. Cartier,*
    486 U.S. 281 (1988) ................................................................................................ 15

*Landau v. Roundpoint Mortg. Servicing Corp.,*
    925 F.3d 1365 (11th Cir. 2019) ............................................................................... 15

*Miccosukee Tribe of Indians of Fla. v. United States,*
    716 F.3d 535 (11th Cir. 2013) ................................................................................... 5

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................................. 13

*Sierra Club v. Martin,*
    168 F.3d 1 (11th Cir. 1999) .................................................................................... 13

*Sierra Club, Inc. v. Leavitt,*
    488 F.3d 904 (11th Cir. 2007) ................................................................................ 13

*Simmons v. Block,*
    782 F.2d 1545 (11th Cir. 1986) .............................................................................. 13

*United States v. Miles,*
    2023 WL 4853606 (11th Cir. 2023) ........................................................................ 19

## Statutes

5 U.S.C. § 701 ....................................................................................... 1

5 U.S.C. § 706 ............................................................................... 13, 20

28 U.S.C. § 114 .................................................................................. 7

28 U.S.C. § 203 ............................................................................. 9, 11

28 U.S.C. § 385.3 ............................................................................... 8

28 U.S.C. § 385.28 ............................................................................. 8

28 U.S.C. § 385.35 ........................................................................... 17

28 U.S.C. § 385.36 ............................................................................. 8

28 U.S.C. § 601 ....................................................................... *passim*

28 U.S.C. § 1291 ............................................................................... 1

28 U.S.C. § 1331 ............................................................................... 1

28 U.S.C. § 1361 ............................................................................... 1

28 U.S.C. § 601 ................................................................................. 7

42 U.S.C. § 36 ................................................................................. 12

42 U.S.C. § 4321 ............................................................................. 12

42 U.S.C. § 14-15 ........................................................................... 12

42 U.S.C. § 27-38 ........................................................................... 12

## Rules

33 C.F.R. § 14 ................................................................................. 17

33 C.F.R. § 16 ................................................................................. 18

33 C.F.R. § 385 ............................................................................. 3, 7

33 C.F.R. § 601 ............................................................................... 16

33 C.F.R. § 385.3 ........................................................................ 3, 17

33 C.F.R. § 385.5 ............................................................................. 8

33 C.F.R. § 385.8 ........................................................................... 16

33 C.F.R. § 385.28 ....................................................................... 7, 8

33 C.F.R. § 385.36 ......................................................................... 17

Fed. R. App. P. 4 ............................................................................. 1

**Other**

Pub. L. No. 80-858, § 203, 62 Stat. 1176 (1948) ........................................................ 4-5

Pub. L. No. 106-541, § 601(b)(1)(A), 114 Stat. 2680 (2000) .................................... *passim*

Pub. L. No. 106-541, § 601(b)(1)(A), 114 Stat. 2681 (2000) ............................................ 7

Pub. L. No. 106-541, § 601(h)(5)(A), 114 Stat. 2690 (2000) .................................... *passim*

Pub. L. No. 115-270, § 1308(a), 132 Stat. 3765 (2018) .................................................. 10

Pub. L. No. 115-270, § 1308(a), 132 Stat. 3819 (2018) .................................................. 10

## STATEMENT REGARDING ADOPTION OF
## BRIEFS OF OTHER PARTIES

In addition to the arguments made in this brief, the Cooperative adopts the arguments set forth in the briefs filed by the other Appellants, U.S. Sugar Corporation and Okeelanta Corporation.

## JURISDITIONAL STATEMENT

The district court exercised jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 5 U.S.C. §§ 701–706 (judicial review under the Administrative Procedure Act), and 28 U.S.C. § 1361 (jurisdiction to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff).

On March 21, 2023, the district court entered its order on the parties' cross-motions for summary judgment. The district court entered final judgment on March 22, 2023. Plaintiff-Appellant, the Cooperative, filed a timely notice of appeal on May 19, 2023. *See* Fed. R. App. P. 4(a)(1)(B).

This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether the district court erred in holding that the U.S. Army Corps of Engineers' approval of the EAA Project satisfied the requirements of the Water Resources Development Act of 2000 ("WRDA 2000").

2. Whether the district court erred in holding that the U.S. Army Corps of Engineers' approval of the EAA Project satisfied the National Environmental Policy Act ("NEPA").

In this brief, Plaintiff-Appellant, the Cooperative, only addresses Issue No.1. As noted above, it adopts the briefs of the other Appellants that address the NEPA issue.

## INTRODUCTION

Promises are made to be kept. That's especially so when Congress makes the promise through duly enacted legislation and the U.S. Army Corps of Engineers ("the Corps") doubles down on the promise through rulemaking. The promise here was that water sources that farmers in the Everglades Agricultural Area ("EAA") rely on to grow their crops can't be taken from them without first replacing those sources.

Congress made the promise in the Water Resources Development Act of 2000 ("WRDA 2000"), which authorized the Comprehensive Everglades Restoration Plan ("CERP"). Pub. L. No. 106-541, § 601(h)(5)(A), 114 Stat. 2690. Entitled "Savings Clause," § 601(h)(5)(A) of WRDA 2000 provides in clear and unequivocal terms that "[u]ntil a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act is available to replace the water to be lost as a result of implementation of the [CERP]," the Corps "shall not eliminate or transfer existing legal sources of water" for "agricultural … water supply." *Id.*

The Corps carried forward the promise made in WRDA 2000 when it adopted Programmatic Regulations that call for specific analyses to ensure that CERP projects comply with the Savings Clause. *See* 33 C.F.R. Part 385. These analyses are required to assess changes measured against a very specific baseline—the "Pre-CERP baseline," which the Corps defines as "the hydrologic conditions … on the date of enactment of WRDA 2000." 33 C.F.R. § 385.3.

But the Corps never conducted a proper Savings Clause analysis for the CERP project at issue—an interrelated Reservoir and Stormwater Treatment Area ("STA") known as the "EAA Project."[1] Specifically, the Corps ignored the very specific pre-CERP baseline called for under WRDA 2000 and the Corps' Programmatic Regulations in assessing whether the EAA Project will transfer or eliminate existing legal sources of water. The baseline mandated by both statute and rule—the hydrological conditions as of WRDA's enactment in 2000—gave way to a new baseline that assumed far less water for farmers within the EAA like the Cooperative and its members.

In upholding the Corps' Savings Clause analyses, the district court ignored the plain language of WRDA 2000 that unambiguously requires the Corps to evaluate water supply impacts of CERP projects as compared to water supplies *available* on the date of enactment of this Act." WRDA 2000, § 601(h)(5)(A) (emphasis added). Instead, the court accepted the Corps' use of water supplies available after some "intervening

---

[1] Congress approved the Central Everglades Planning Project in WRDA 2016; the EAA Project was authorized in WRDA 2018 as a post-authorization change to this project.

non-CERP activity"—a concept wholly invented by the Corps without any support in the statute or regulations. This was error.

## STATEMENT OF THE CASE

The issues in this case center on the Corps' evaluation of potential water supply impacts of the EAA Project on existing water users, including the Cooperative and its members. An overview of the area, its projects, and the flow of water is required to fully understand the issues.

### A. Lake Okeechobee and the CS&F Project.

Lake Okeechobee is the heart of the water resources system in central and south Florida. The Lake provides drinking water for surrounding communities and serves as a source of irrigation for EAA farmers, including the Cooperative and its members. 2015_ROD_059584; 2015_ROD_003434–003435; PERMIT_009643; ECF No. 28-1, ¶¶ 12–14. The Lake is impounded by a dike system, known as the "Herbert Hoover Dike," which Congress originally authorized in the Rivers and Harbors Act of 1930 following a series devastating hurricanes that caused massive flooding south of the Lake. Pub. L. No. 71-520, 46 Stat. 918, 925.

Another major hurricane in 1947 prompted the need for additional flood and storm damage reduction, particularly around and south of Lake Okeechobee. As a result, Congress passed the Flood Control Act of 1948 authorizing the Central and Southern Florida Project ("C&SF Project"). Pub. L. No. 80-858, § 203, 62 Stat. 1176

(1948). Congress viewed the CS&F Project as "the comprehensive plan for flood control and other purposes in central and southern Florida as recommended by the Chief of Engineers." *Id.* Among other things, the CS&F Project included raising existing levees around Lake Okeechobee and constructing new levees, channels, and other works to allow the Corps to manage water levels within the Lake.

Lake Okeechobee is the water source used by farmers in the EAA to irrigate their crops and prevent soil subsidence, wildfire, and other damage. The Lake also provides urban water supply to municipalities, such as the City of Okeechobee, and recharges the Lower East Coast Biscayne Aquifer. 2015_ROD_003356; 2015_ROD_003525; 2015_ROD_003555-56; 2020_ROD_041704; ECF No. 28-1 at ¶¶ 12–21. When there isn't enough water in the lake, people must cut back their water use, which harms their crops, property, and businesses. *Id.*; 2015_ROD_003348; 2015_ROD_003501; 2015_ROD_003356; ECF No. 28-1 at ¶¶ 15–23.

B.    **Lake Okeechobee Regulation Schedules.**

The Herbert Hoover Dike and several water control structures allow the Corps to manage Lake Okeechobee to meet different objectives, including flood control and water supply. The Corps establishes a "regulation schedule" that governs the operation of various structures and maintains appropriate water supplies. *See Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 541–42 (11th Cir. 2013). "The regulation

schedule is a compilation of operating criteria, guidelines, rule curves and specifications that govern the storage and releases from the lake." 2020_ROD_043706.

At the time of WRDA 2000's enactment, the Corps applied the so-called Water Supply and Environment ("WSE") regulation schedule, which maintained higher water levels in Lake Okeechobee than today, meaning that more water supply capacity was available. 2015_ROD_068525.

Due to concerns about the integrity of the Herbert Hoover Dike, on April 28, 2008, the Corps adopted a new regulation schedule, known as "LORS 2008." 2020_ROD_043704. LORS 2008 called for a significant lowering of average water levels in the Lake. Under LORS 2008, the Corps seeks to maintain Lake levels 1.25 feet lower than WSE, which equates to, on average, more than 500,000 acre-feet of lost storage capacity for water supply to existing legal users. PPA_008761; 2020_ROD_040500

Despite assurances that LORS 2008 would be a temporary "interim" schedule until Herbert Hoover Dike repairs were completed, LORS 2008 remains in effect even though those repairs are substantially completed. *See* Order, at 9.

## C.    The Water Resources Development Act of 2000.

On December 11, 2000, Congress enacted the WRDA 2000 that, among other things, authorized CERP as the "framework for modifications and operational changes to the [CS&F] Project that are needed to restore, preserve, and protect the South Florida

ecosystem while providing for other water-related needs of the region, including water supply and flood protection." Pub. L. No. 106-541, § 601(b)(1)(A), 114 Stat. 2681 (2000). WRDA 2000 directed the Corps to implement CERP and to integrate it with ongoing federal and state projects. *Id.* § 601(b)(1)(B).

CERP includes 68 projects. The EAA Project at issue in this case is one of those 68 projects. 2015_ROD_003656; 2015_ROD_003664.

To ensure that the CERP projects don't adversely affect the many people who rely on water from Lake Okeechobee, including the Cooperative and its members, WRDA 2000 includes a Savings Clause. The Savings Clause provides that "[u]ntil a new source of water supply of comparable quantity and quality as that *available on the date of enactment of this Act* is available to replace the water to be lost as a result of implementation of the Plan, the Secretary and non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for … an agricultural or urban water supply." *Id.* § 601(h)(5)(A), 114 Stat. 2690 (emphasis added).

### D.    The Corps' Programmatic Regulations.

In 2003, the Corps promulgated Programmatic Regulations to implement the requirements of WRDA 2000. *See* 33 C.F.R. Part 385. The regulations require the Corps "to develop Operating Manuals to ensure that the goals and purposes of [CERP] are achieved." *Id.* § 385.28(a)(1). An operating manual must include "a system-wide operating plan for the operation of [CERP] projects … and other C&SF Project

features," and must "provide the details necessary for integrating the operation of the individual projects with the system operation." *Id.* § 385.28(a)(2). Operating manuals are also required to describe regulation schedules, making it clear that regulation schedules are part of the comprehensive plan [i.e., CERP]. *Id.* § 385.28(a)(6)(iii).

The Programmatic Regulations carried forward the Saving Clause enacted in WRDA 2000, by requiring that all "operating manuals … be consistent with the savings clause provisions described in the Project Implementation Report and the Project Cooperation Agreement and the provisions of … § 385.36." *Id.* § 385.28(a)(6)(vi). The regulations further require the Corps to determine compliance with the Savings Clause "by comparing the availability of water with [each] recommended project with the availability of water under the pre-CERP baseline." *Id.* § 385.36(a). Critically, the regulations define "pre-CERP baseline" as "the hydrologic conditions … on the date of enactment of WRDA 2000, as modeled by using a multi-year period of record based on assumptions such as … assumed operations of the [C&SF] Project." *Id.* § 385.3.

The Programmatic Regulations also provide that the Corps must "develop a guidance memorandum" that "describe[s] the process for comparing the recommended project with the pre-CERP baseline." *Id.* § 385.36(b). The regulations required the Corps to develop the guidance memorandum by December 2004, and establish "special processes" for its development culminating with "approval by the Secretary of the Army" so that there would be consensus among stakeholders. 33 CFR § 385.5(b). The Corps never issued an approved guidance memorandum as required by the regulations,

but did issue a draft in 2007. 2020_ROD_004262. The draft memorandum asserts that there are some Corps' modifications to the CS&F Project—referred to as "intervening non-CERP activities"—that are not subject to WRDA 2000 and that the Corps need not account for any reduction in water supply from such "intervening non-CERP activities" in subsequent Savings Clause analyses. 2020_ROD_004269-004270.

## E. The EAA Project.

The EAA Project consists of a 10,500-acre reservoir in the EAA that was intended to be operated in tandem with a 6,500-acre STA. 2020_ROD_037008. The purpose of the reservoir is to store water from Lake Okeechobee prior to discharging it to the Everglades or for use as agricultural water supply. PPA_008335; PPA_008512; PPA_008515; 2020_ROD_037010; 2020_ROD_037017. The purpose of the STA is to remove phosphorous from the water it receives from the Lake, via the reservoir, before it's discharged into the Everglades. PERMIT_011596.

As originally contemplated, the EAA Project included a reservoir, but no STA. In 2018, the local sponsor of CERP, the South Florida Water Management District ("SFWMD") issued a Post-Authorization Change Report ("2018 PACR" or "Section 203 Study") to support modification of the EAA Project to include a larger reservoir and an STA. PPA_008320; 2020_ROD_037006; 2020_ROD_037008 (describing SFWMD 240,000 acre-foot reservoir); PPA_008321. Congress authorized the revised

EAA Project as a Post-Authorization Change in 2018, subject to further review by the Corps. Pub. L. No. 115-270, § 1308(a), 132 Stat. 3765, 3819 (Oct. 23, 2018).

In the 2018 PACR, SFWMD prepared a Savings Clause analysis for the revised project (with the STA). 2020_ROD_013469. This analysis compared water supply for the EAA Project to the water supply provided by LORS 2008, and stated that "[t]he original Pre-CERP Baseline … [was] not used for the CEPP PACR analyses." 2020_ROD_013482–013484. As the district court recognized below, use of LORS 2008 as the baseline "provides a meaningfully lower water supply than the WSE" regulation schedule in effect on the date of WRDA 2000's enactment. Order, at 11. "That reduction translates to approximately 500,000 acre-feet of lost storage capacity for existing legal water users." *Id.*

In January 2020, the Corps issued a Final Environmental Impact Statement ("FEIS") for the revised EAA Project design. On April 17, 2020, the Corps issued a Record of Decision ("ROD") approving construction of the STA, and on the same day issued a permit to allow the SFWMD to begin work on the STA. PERMIT_011623; PERMIT_011769. In the April 2020 ROD, the Corps acknowledged that the STA "was designed to function with the [EAA] reservoir," but left open the possibility that the reservoir and STA would not be operated in tandem. PERMIT_011595. The Corps never analyzed the water supply impacts of operating the STA without the reservoir as now contemplated.

On May 1, 2020, the Corps issued a second FEIS for the SFWMD's Section 203 Study (the "May 2020 FEIS"). 2020_ROD_037004. The May 2020 FEIS addresses construction of the reservoir and the STA. 2020_ROD_037008. In it, instead of preparing a new Savings Clause analysis, the Corps simply incorporated the 2018 PACR analysis. PERMIT_006534, PERMIT_007095–07170; 2020_ROD_037242.

In April 2021, the Corps and SFWMD entered into a Project Partnership Agreement ("PPA") that governs the two agencies' responsibilities for building and operating the EAA Project. PPA_019710. The PPA provides that the project is subject to the Savings Clause but refers back to the May 2020 FEIS. PPA_019711–019712.

Construction of the STA is currently underway, ECF No. 45 at ¶37, and is scheduled to be completed in 2023. 2020_ROD_031002. The reservoir is not scheduled to be completed until 2029 at the earliest. PPA_018965.

### F.     The proceedings below.

The Cooperative challenged the Corps' approvals of the EAA Project under the Administrative Procedure Act ("APA"), claiming that: (1) the Corps' use of the water supply provided by LORS 2008 as the baseline for its Savings Clause analyses rather than the pre-CERP baseline (i.e., December 11, 2000), constitutes a violation of WRDA 2000 and the APA; and (2) the Corps' failure to evaluate the impact on agricultural and urban water supply if the EAA Reservoir and STA are not operated in tandem

constitutes a failure to evaluate all alternatives to the agency's proposed action in violation of National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*

The district court consolidated the Cooperative's case with similar cases brought by appellants Okeelanta Corporation and United States Sugar Corporation. Doc.20.

On March 21, 2023, the district court entered an order granting the Corps' Motion for Summary Judgment and denying the plaintiffs/appellants' Motion for Summary Judgment. As to the Savings Clause issue, the district court stated that it gave no deference to the Corps' interpretation of WRDA 2000, because the statute is not ambiguous. Order, at 16. Yet the court accepted the Corps' interpretation of the statute as allowing the Corps to disregard the water supply impacts of "intervening non-CERP events" in subsequent Savings Clause analyses. *See id.* at 14-15. The court further held that LORS 2008 was an "intervening non-CERP event" that lowered the baseline for purposes of the Corp's Savings Clause analysis. *See id.*

As to the NEPA claims, the district court acknowledged that the Corps' NEPA analyses assumed that the STA and reservoir would operate in tandem. *Id.* at 36. However, the court relied on the assurances from the Corps' counsel assurance at oral argument that the Corps would do additional NEPA analyses before the STA starts stand-alone operations. Based on those assurances, the district court entered summary judgment for the Corps due to "the broad discretion that agencies are given as to when they perform a NEPA analysis." *Id.* at 27-38.

As noted above, this brief only addresses the Savings Clause issue. As stated above, the Cooperative adopts the briefs of the other appellants addressing the NEPA issue.

## STANDARD OF REVIEW

This Court reviews de novo the district court's grant of summary judgment and use the same standard of review utilized by the district court. *Sierra Club Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007). Under the APA, the standard is whether the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency decision is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). The Court "must overturn agency actions which do not scrupulously follow the regulations and procedures followed by the agency itself." *Sierra Club v. Martin*, 168 F.3d 1, 4 (11th Cir. 1999) (quoting *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986)).

## SUMMARY OF ARGUMENT

The district court held that "the Corps may treat the water elevation set by LORS 2008 as a permissible baseline for its Savings Clause analyses." Order, at 15. This was error.

The district court's holding is entirely inconsistent with the text of the Savings Clause. In the Savings Clause, Congress said that the baseline is the "water supply of comparable quantity … as that available on the date of enactment of this Act" in 2000, not 2008. And nowhere in the enacted legislation did Congress allow for the concept of "intervening non-CERP activities" to allow the Corps to ignore the substantial impacts of LORS 2008 that "eliminated an 'existing legal source[] of water' for which Plaintiffs use for agriculture." Order, at 22. Indeed, such a reading is inconsistent with both the plain text of the statute *and* the Corps' own regulations.

## ARGUMENT

I.   **In upholding the Corps' application of the Savings Clause, the district court failed to give proper effect to the plain language of the WRDA 2000 and the Corps' Programmatic Regulations.**

Because the Corp's Savings Clause analysis is a matter of statute, "[t]he controlling principle in this case is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written." *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476 (1992). An agency's interpretation is given deference only when the statute is ambiguous: "If the intent of Congress is clear, that is the end of the matter;

for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier*, 486 U.S. 281, 291 (1988); *Dotson v. United States*, 30 F.4th 1259, 1265–66 (11th Cir. 2022) (same).

The same holds true when the court construes agency regulations. The court "evaluate[s] whether the plain language of the regulation unambiguously answers the question at issue when [it] consider[s] the regulatory language itself, the particular context in which that language appears, and the broader context and purpose of the regulatory scheme as a whole." *Landau v. Roundpoint Mortg. Servicing Corp.*, 925 F.3d 1365, 1369 (11th Cir. 2019).

## A. The Savings Clause furthers CERP's objective to provide water supply by assuring that CERP projects will not eliminate existing legal sources of water.

This case concerns one component of a statute —WRDA 2000— that approved a "comprehensive plan" (CERP) to serve as the "framework for modifications" to the C&SF Project—the system of canals, reservoirs, and structures that move water around in South Florida. WRDA 2000, § 601(b)(1)(A). CERP's "overarching objective" is to restore, preserve and protect the South Florida ecosystem "while providing for other

water-related needs of the region, *including water supply* and flood protection." *Id.* § 601(h)(1) (emphasis added); 33 C.F.R. § 385.8(a).

Congress explained that CERP was "approved as a framework for modifications and operational changes to the [CS&F] Project that are needed to restore, preserve, and protect the South Florida ecosystem while providing for other water-related needs of the region, *including water supply* and flood protection." *Id.* § 601(b)(1)(A) (emphasis added).

As the Corps advised Congress when it presented CERP for authorization in 1999, "assurances" that "the current level(s) of service for water supply" will be protected are "key to the successful implementation of the Comprehensive Plan." 2015_ROD_003733. Congress provided such assurances when it adopted the "Savings Clause" in Section 601(h)(5)(A) of WRDA 2000.

In relevant part, the Savings Clause provides:

(5) SAVINGS CLAUSE.—

    (A) NO ELIMINATION OR TRANSFER.—Until a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act is available to replace the water to be lost as a result of implementation of the Plan, the Secretary and the non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for—
        (i) an agricultural or urban water supply;

WRDA 2000, § 601(h)(5)(A). The language couldn't be clearer. Congress is promising existing legal water users that their sources of water supply will not "be lost as a result of implementation of the Plan" until a new water supply source of "comparable quantity

and quality available on the date of enactment" in 2000 is available to replace it. *Id.* The impact of a particular project on existing legal sources is to be measured against water supplies "available on the date of enactment" of WRDA 2000.

The Corps' Programmatic Regulations confirm as much. They say that "[t]he Corps of Engineers and the non-Federal sponsor shall determine if implementation of the project will cause an elimination or transfer of existing legal sources of water *by comparing the availability of water with the recommended project with the pre-CERP baseline* developed in accordance with § 385.35(a)." 33 CFR § 385.36(a) (emphasis added). The regulations further provide that the "pre-CERP baseline" for determining whether such losses may occur consists of the "hydrologic conditions … *on the date of enactment of WRDA 2000.*" 33 C.F.R. § 385.3 (emphasis added).

## B. The district court effectively rewrote the Saving Clause and Programmatic Regulations by allowing the Corps to substitute LORS 2008 for the pre-CERP baseline.

Ignoring the plain language of the statute and duly adopted rules, the district court held that "the Corps may treat the water elevation set by LORS 2008 as a permissible baseline" for its Savings Clause analyses. Order, at 15. To arrive at this statute-bending conclusion, the court first said that the case "boils down to two questions," the first of which is whether "there is such a thing as an 'intervening non-CERP activity,'" and the second is whether "LORS 2008 [was] an intervening non-CERP activity." *Id.* at 14.

As to the first question, the court said this: "[t]he text of the Savings Clause states that it only applies 'as a result of implementation of the Plan (i.e., CERP).'" *Id.* at 16 (quoting WRDA 2000, § 601(h)(5)(A)(i)). Based on this language, the court accepted the Corps' position that activities that don't "implement[] the Plan" are "intervening non-CERP activities" that are excluded from the Savings Clause.

As to the second question, the district court focused on whether LORS 2008's original adoption triggered the Savings Clause. The court concluded that it did not because LORS 2008 was not an "operational change" intended to facilitate a CERP project; rather, the court saw LORS 2008 as a "change[] to the Corps' authority to ensure the structural integrity of the Dike[.]"

The district court's analysis was flawed from the start. Nothing in WRDA 2000 or the Programmatic Regulations refer to, or even allude to, "intervening non-CERP activities" that the Corps can use to replace the pre-CERP baseline. It is a concept made up by the Corps in its draft technical memorandum which was never officially approved as required by the Programmatic Regulations. And whether or not LORS 2008 triggered the Savings Clause when originally adopted is irrelevant. That is because the Corps inextricably linked LORS 2008 to a CERP Project when it substituted LORS 2008 for the pre-CERP baseline in its Savings Clause analysis for the EAA Project.

LORS 2008 doesn't come close to being the right baseline. The district court itself recognized that "[w]hatever quantity comes close to that which might constitute a "comparable quantity, LORS 2008 is not it." Order, at 23 (record citations omitted).

As the district court also recognized, "LORS 2008 eliminated an 'existing legal source[]
of water' for which [appellants] use for agriculture." Order, at 22. By allowing the Corps
to use LORS 2008 rather than the WSE schedule in effect when Congress enacted
WRDA 2000, the district court gave no meaning to the phrase "water supply of
comparable quantity … as that was available on the date of enactment[.]" As a result,
under the district court's holding, the pre-CERP baseline called for in the statute and
rule is a nullity. And, because LORS 2008 is now the Savings Clause baseline until
replaced by another regulation schedule, the elimination of water supply sources to
agricultural and other existing users caused by LORS 2008 has effectively been codified.
This is contrary to the plain meaning of the Savings Clause.

## CONCLUSION

The courts "are not allowed to add or subtract words from a statute," *Friends of
the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009), or to
"rewrite a statute to say something that Congress did not enact." *United States v. Miles*,
2023 WL 4853606, at *18 (11th Cir. July 31, 2023); *Albritton v. Cagle's Inc.*, 508 F.3d
1012, 1017 (11th Cir. 2007) ("We are not empowered to rewrite statutes."). Yet that is
exactly what the district court did here. The district court rewrote the Savings Clause
by subtracting the phrase "water supply of comparable quantity… as that available on
the date of enactment" from the statutory text and effectively replacing it with "water
supply resulting from intervening non-CERP activities." As a result, the district court

erroneously upheld the Corps' Savings Clause analysis even though it was "arbitrary and capricious" and "not in accordance with law" in violation of the APA. 5 U.S.C. § 706(2)(A).

This Court must reverse.

Respectfully submitted,

/s/ Gary V. Perko
Gary V. Perko (FBN 855898)
Gary K. Hunter (FBN 949779)
Mohammad O. Jazil (FBN 72556)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 South Monroe Street, Suite 500
Tallahassee, FL 32301
(850) 274-1690
GPerko@holtzmanvogel.com
GHunter@holtzmanvogel.com
MJazil@holtzmanvogel.com

Counsel for Plaintiff-Appellant
Sugar Cane Growers Cooperative of
Florida

## CERTIFICATE OF COMPLIANCE

This brief contains 4,529 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it's prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: August 23, 2023                          _/s/ Gary V. Perko_____


## CERTIFICATE OF SERVICE

I certify that this brief has been e-filed on ECF, which will email everyone requiring notice.

Dated: August 23, 2023                          _/s/ Gary V. Perko_____