Nos. 23-11683, 23-11684, 23-11685

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES SUGAR CORPORATION, et al.,
*Plaintiffs/Appellants*,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, et al.,
*Defendants/Appellees.*

Appeal from the United States District Court
for the Southern District of Florida
No. 21-cv-81505 (Hon. Donald M. Middlebrooks)

**FINAL BRIEF FOR FEDERAL APPELLEES**

TODD KIM
*Assistant Attorney General*
ALLEN M. BRABENDER
PETER KRYN DYKEMA
ARIELLE MOURRAIN JEFFRIES
*Attorneys*
Environment & Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3140
arielle.jeffries@usdoj.gov

**Oral argument is requested.**

**CERTIFICATE OF INTERESTED PERSONS**

Bishop, Timothy S.

Booth, Colonel James L.

Brabender, Allen M.

Captains for Clean Water, Inc.

Carlton Fields, P.A.

Carpenter, Elizabeth Fata

Clement & Murphy, PLLC

Clement, Paul D.

Coglianese, Matthew Patrick

Connor, Michael L.

Dykema, Peter Kryn

Everglades Foundation, Inc.

Feeley, Matthew J.

Florida Bay Forever, Inc.

Florida Fruit & Vegetable Association

Florida Farm Bureau Federation

Florida Keys Fishing Guides Association, Inc.

Glass, Robert C.

Gunster, Yoakley & Stewart P.A.

Holtzman Vogel Baran Torchinsky & Josefiak, PLLC

Hunter, Gary K.

Interlandi, Lisa

Islamorada Chamber of Commerce, Inc.

Jazil, Mohammed O.

Jeffries, Arielle Mourrain

Karp, David A.

Kelly, Colonel Andrew D.

Kupfer, Avi M.

Lawrence, Andrew C.

Lomonico, Julia

Madden, Deborah K.

Matthewman, William

Mayer Brown LLP

McAliley, T. Neal

Middlebrooks, Donald M.

Munson, Gregory M.

Okeelanta Corporation

Perko, Gary V.

Phillips, Luna E.

Pinkham, James A.

Samson, A. Ansley

Sanibel-Captiva Conservation Foundation, Inc.

Sanibel-Captiva Islands Chamber of Commerce, Inc.

Scala-Olympio, Laura E.

South Florida Water Management District

Spellmon, Lt. Gen. Scott A.

Sugar Cane Growers Cooperative of Florida

Sullivan, Sally J.

Throckmorton, Charles

U.S. Army Corps of Engineers

U.S. Attorney's Office, Southern District of Florida

U.S. Department of Justice, Environment and Natural Resource Division

U.S. Sugar Corporation

Wormuth, Christine E.

**STATEMENT REGARDING ORAL ARGUMENT**

Federal Appellees believe that oral argument would be useful to the Court given the extensive administrative record and the complexity of the government project at issue.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ...........................................i

TABLE OF AUTHORITIES ................................................................. iv

INTRODUCTION .............................................................................1

STATEMENT OF JURISDICTION ......................................................2

STATEMENT OF THE ISSUES ...........................................................2

STATEMENT OF THE CASE .............................................................3

      A.    Statutory and regulatory background............................................3

           1.    Central and South Florida Project ........................................3

           2.    Water Resources Development Acts ....................................6

           3.    NEPA ..................................................................8

      B.    Factual background..........................................................9

           1.    Central Everglades Planning Project....................................9

           2.    Studies and permitting.........................................14

      C.    Proceedings below .........................................................16

SUMMARY OF ARGUMENT .............................................................17

STANDARD OF REVIEW ................................................................19

ARGUMENT.................................................................................19

I.    Plaintiffs lack standing..............................................................19

A.    Plaintiffs do not demonstrate standing for their WRDA claim. .....................................................................20

B.    Plaintiffs do not demonstrate standing for their NEPA claim. ......................................................................24

II.    The project complies with the Savings Clause because it does not eliminate or transfer an existing legal source of water. ...........................................................................29

A.    By its plain text, the Savings Clause applies only when the Corps eliminates or transfers existing water sources when implementing a CERP project. ...................29

B.    WRDA's legislative history, statutory history, and implementing regulations confirm the Savings Clause's plain meaning. ...................................................33

C.    Plaintiffs' contrary arguments lack merit. ....................................35

D.    Any error in the Corps' Savings Clause analysis would be harmless. ..........................................................40

III.    The Corps fully complied with NEPA when considering and approving the project. ........................................................41

CONCLUSION .................................................................................48

CERTIFICATE OF COMPLIANCE ..................................................50

GLOSSARY .......................................................................................51

# TABLE OF AUTHORITIES

**Cases**

*Baccarat Fremont Developers, LLC v. U.S Army Corps of Eng'rs,*
    425 F.3d 1150 (9th Cir. 2005) ...........................................................................29

*Boda v. United States,*
    698 F.2d 1174 (11th Cir. 1983) .........................................................................29

*Boumediene v. Bush,*
    553 U.S. 723 (2008) ...........................................................................................34

*Citizens for Smart Growth v. Sec'y of Dep't of Transp.,*
    669 F.3d 1203 (11th Cir. 2012) .........................................................................45

*City of Boston Delegation v. FERC,*
    897 F.3d 241 (D.C. Cir. 2018) ...........................................................................45

*City of Oxford v. FAA,*
    428 F.3d 1346 (11th Cir. 2005) .........................................................................44

*Clapper v. Amnesty Int'l,*
    568 U.S. 398 (2013) ...........................................................................................29

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) ...........................................................................................20

*Delaware Riverkeeper Network v. FERC,*
    753 F.3d 1304 (D.C. Cir. 2014) .........................................................................45

*\*Dep't of Education v. Brown,*
    600 U.S. 551 (2023) ............................................................... 21, 22, 23, 24

*Dep't of Transp. v. Public Citizen,*
    541 U.S. 752 (2004) .............................................................................. 42, 45

*Fla. Wildlife Fed'n Inc. v. U.S. Army Corps of Eng'rs,*
    859 F.3d 1306 (11th Cir. 2017) ...........................................................................3

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ..........................................................................24

*Fuerst v. Hous. Auth. of Atlanta*,
  38 F. 4th 860 (11th Cir. 2022) ........................................................33

*Heyman v. Cooper*,
  31 F.4th 1315 (11th Cir. 2022) .......................................................30

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) ..........................................................................43

*Lowman v. FAA*,
  No. 21-14476, 2023 WL 6632725 (11th Cir. Oct. 12, 2023) ...........46

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .............................................................. 19, 20, 23

*Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs*,
  619 F.3d 1289 (11th Cir. 2010) .........................................................3

*Miccosukee Tribe of Indians of Fla. v. United States*,
  716 F.3d 535 (11th Cir. 2013) ...........................................................4

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
  571 U.S. 161 (2014) ..........................................................................34

*Muransky v. Godiva Chocolatier, Inc.*,
  979 F.3d 917 (11th Cir. 2020) .........................................................20

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) ..........................................................................41

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ..................................................................... 8, 10

*Sec'y of Lab., Mine Safety & Health Admin. v. W. Fuels-Utah, Inc.*,
  900 F.2d 318 (D.C. Cir. 1990) .........................................................36

*Sierra Club v. Peterson*,
  717 F.2d 1409 (D.C. Cir. 1983) .......................................................42

*South Carolina v. United States Army Corps of Eng'rs*,
   66 F.4th 189 (4th Cir. 2023) ..................................................38

*\*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .................................................... 19, 20

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ..............................................................24

*Taxpayers Watchdog, Inc. v. Stanley*,
   819 F.2d 294 (D.C. Cir. 1987) ..........................................46

*United States v. Garcia-Sandoval*,
   703 F.3d 1278 (11th Cir. 2018) ........................................23

*United States v. Schwarzbaum*,
   24 F.4th 1355 (11th Cir. 2022) .........................................19

*United States v. Texas*,
   599 U.S. 670 (2023) .................................................... 25, 28

*Wyoming Outdoor Council v. U.S. Forest Serv.*,
   165 F.3d 43 (D.C. Cir. 1999)..............................................42

**Statutes**

5 U.S.C. § 704..........................................................................29

5 U.S.C. § 706................................................................... 19, 41

28 U.S.C. § 1291.....................................................................2, 3

28 U.S.C. § 2401(a) ...............................................................35

33 U.S.C. § 408................................................................... 15, 17

42 U.S.C. § 4332(C) ............................................................ 8, 42

Act of June 30, 1948, ch. 771, 62 Stat. 1175 .....................4

Fla. Stat. § 373.1501(5)(d) ....................................................7

Pub. L. No. 100-676 ............................................................34

Pub. L. No. 104-303 ..............................................................6

Pub. L. No. 106-541 ..............................................................6

Pub. L. No. 115-270 ...................................................... 11, 40

Pub. L. No. 116-260 ...................................................... 11, 40

Pub. L. No. 117-263 ............................................................40

**Regulations**

33 C.F.R. § 385.1 ..................................................................6

33 C.F.R. § 385.26 ................................................................8

*33 C.F.R. § 385.36 ........................................... 6, 8, 35, 41

33 C.F.R. § 385.5 ..................................................................6

40 C.F.R. § 1502.9 ..............................................................42

40 C.F.R. § 1508.25 (2020) ................................................43

**Other Authorities**

S. Rep. No. 106-362 (2000) ............................................ 6, 34

Wright & Miller, Federal Practice and Procedure § 3531.5 (3d ed. 2023) .....22

**INTRODUCTION**

The Comprehensive Everglades Restoration Plan (CERP) is one of the largest ecosystem restoration efforts that Congress has ever authorized. At issue in this case are two connected components of one CERP project: a reservoir and a water treatment facility. Those two components are intended to work together to store, treat, and release water to the Everglades and the Everglades National Park that would otherwise be lost to the Atlantic Ocean and the Gulf of Mexico via estuaries. Along with achieving the ecological benefits at the heart of CERP, the project increases the water supply available to agricultural users in the area, primarily by constructing a 78-billion-gallon reservoir of new water.

Plaintiffs are among those agricultural users. They challenge the U.S. Army Corps of Engineers' approval of the project, claiming that it violates the Water Resources Development Act of 2000 (WRDA) and the National Environmental Policy Act (NEPA). But Plaintiffs do not have standing to challenge the project, which does not cause any injury to Plaintiffs' water supply. In any event, the district court correctly concluded that WRDA's Savings Clause bars the Corps only from implementing CERP projects in a manner that eliminates or transfers water—it does not make the Corps a

guarantor of water when intervening events reduce supply. The project here does not eliminate or transfer Plaintiffs' water source, so it is consistent with WRDA. The district court also correctly held that the Corps reasonably decided to wait to analyze the environmental effects of standalone operation of the treatment area under NEPA until those operations were proposed.

## STATEMENT OF JURISDICTION

The United States agrees with Plaintiffs that this Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 over Plaintiffs' appeal from the final judgment entered on March 22, 2023, and that Plaintiffs timely filed their Notice of Appeal. Plaintiffs' jurisdictional statements incorrectly imply, however, that the district court had jurisdiction. As described below, Plaintiffs lack Article III standing to pursue their claims.

## STATEMENT OF THE ISSUES

1.      Do Plaintiffs have Article III standing to challenge the project under WRDA and NEPA?

2.      Did the Corps' approval of the project violate WRDA's Savings Clause?

3.    Did the Corps comply with NEPA by considering the environmental effects of the proposed project as a whole, which anticipated the reservoir and stormwater-treatment area operating in tandem?

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

#### 1.    Central and South Florida Project

Lake Okeechobee—the largest lake in the southeastern United States—is a vital part of the south-Florida watershed and a key source of freshwater that both nourishes the nearby Everglades and supplies water for farming and drinking. J.A.608. The Lake provides water for municipalities, agriculture, and downstream ecosystems in the dry season and provides flood control in the wet season. *Id.*

Since the late nineteenth century, the U.S. Army Corps of Engineers and the State of Florida have managed the Lake's waters to balance those multiple purposes. *See Fla. Wildlife Fed'n Inc. v. U.S. Army Corps of Eng'rs*, 859 F.3d 1306, 1311 (11th Cir. 2017).  In the early twentieth century, south Florida suffered from a series of devastating floods, including a hurricane that breached the Lake Okeechobee levee, drowning over 2,000 people. *See Miccosukee Tribe of Indians of Fla. v. U.S. Army Corps of Eng'rs*, 619 F.3d 1289,

1292 (11th Cir. 2010). Responding to those disasters, Congress enacted the Rivers and Harbors Act of 1930, Pub. L. No. 71-520, 46 Stat. 918. That Act federalized many water-management projects in central and south Florida and authorized the construction of a taller and more robust levee, now known as the Herbert Hoover Dike, to contain the Lake. *Id.*

In 1948, to expand federal involvement in water management in the region, Congress authorized the Central and South Florida Project (C&SF Project). *See* Act of June 30, 1948, ch. 771, § 203, 62 Stat. 1175. That project comprises an "elaborate network of water control structures spanning thousands of miles, including canals, levees, pumping stations, gates, and dams." *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 538 (11th Cir. 2013).

Today the Corps manages the Lake for navigation, flood control, and other purposes. To those ends, the Corps has adopted different regulation schedules over the decades to balance the various purposes of the C&SF Project. A regulation schedule is a guideline that water managers use to regulate the inflow and outflow of water through water-control structures. J.A.1211. Over the last twenty years, the Corps has modified the Lake's

regulation schedule once—in 2008—and it is currently in the process of finalizing a new regulation schedule.

Prior to 2008, Lake Okeechobee was operated under the Water Supply and Environment Regulation Schedule. J.A.1212. The Corps modified that schedule in the 2008 Lake Okeechobee Regulation Schedule primarily due to concerns about the structural integrity of the Herbert Hoover Dike. J.A.1104. The 2008 regulation schedule lowered the Lake's maximum water elevation by a little over a foot—from 18.53 feet to 17.25 feet above sea level. *Id*. The Corps planned for that schedule to remain in force until the Corps replaced it with a new regulation schedule or repaired the dike. J.A.1106. The Corps recently repaired the dike and is currently in the process of finalizing a new regulation schedule. *See LOSOM (Lake Okeechobee System Operating Manual)*, U.S. Army Corps of Engineers Jacksonville District, https://perma.cc/CB85-YYBX (last visited Nov. 12, 2023). Issuing a regulation schedule is a complex undertaking that often takes multiple years and significant process, including NEPA analysis, public participation, and stakeholder engagement. *See id.; see also* J.A.1105.

## 2. Water Resources Development Acts

Unfortunately, early efforts to contain the Lake had unintended adverse consequences for the Everglades and south Florida ecosystems. S. Rep. No. 106-362, at 35 (2000). To address those consequences, Congress enacted a series of water resources development acts directing the Corps to develop a comprehensive plan "for the purpose of restoring, preserving, and protecting the South Florida ecosystem." Pub. L. No. 104-303, § 528(b), 110 Stat. 3658, 3767-68 (1996). In 1999, the Corps released that plan (known then as the Yellow Book or Restudy). The following year, Congress adopted the Corps' plan, now known as the Central Everglades Restoration Plan (CERP). Pub. L. No. 106-541, § 601, 114 Stat. 2572 (2000) (WRDA); *see also* J.A.991. "As approved by Congress, the Plan contains 68 major components that anticipate the creation of approximately 217,000 acres of reservoirs and wetland-based water treatment areas, wastewater reuse plants, seepage management, and the removal of levees and canals in natural areas." J.A.743.

In WRDA, Congress directed the Corps to "promulgate programmatic regulations to ensure that the goals and purposes of the Plan are achieved." WRDA § 601(h)(3)(A). Those regulations "establish the processes necessary for implementing the Plan." 33 C.F.R. § 385.1. Among other things, the

regulations establish a process for developing project-implementation reports, which describe CERP projects and document compliance with WRDA. WRDA § 601(h)(4)(A); 33 C.F.R. § 385.36(a). The regulations also contemplate that the Corps would formulate guidance memoranda. 33 C.F.R. § 385.5. The Corps has developed draft guidance through the public notice-and-comment process, but the guidance has not been signed by the pertinent Army official. *See* 70 Fed. Reg. 24008-09 (May 6, 2005); 72 Fed. Reg. 58833-34 (Oct. 17, 2007); *see also* J.A.748-49.

Central to this appeal, WRDA includes a Savings Clause which provides:

> Until a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act is available to replace the water to be lost as a result of implementation of the Plan, the Secretary and non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for . . . an agricultural or urban water supply.

WRDA § 601(h)(5)(A)(i).

Because the South Florida Water Management District (SFWMD), a state agency, serves as a partner in implementing CERP projects, the Savings Clause was incorporated into state law, which similarly requires that:

[i]n its role as local sponsor for the project, [SFWMD] shall . . . provide reasonable assurances that the quantity of water available to existing legal users shall not be diminished by implementation of project components so as to adversely impact existing legal users[.]

Fla. Stat. § 373.1501(5)(d).

The Corps' regulations require that project-implementation reports for CERP projects include a Savings Clause analysis to evaluate whether existing legal sources of water will be eliminated or transferred as a result of project implementation. 33 C.F.R. § 385.26(x). If a project is expected to eliminate or transfer an existing legal source of water, the project-implementation report must include an implementation plan that ensures a new source of water of comparable quantity and quality is available to replace the source that would be transferred or eliminated. 33 C.F.R. § 385.36(a).

### 3.     NEPA

NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NEPA's requirements are purely procedural, requiring only that agencies take a hard look at the environmental effects of a proposed action before making an

irretrievable commitment of resources. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

## B. Factual background

### 1. Central Everglades Planning Project

The Central Everglades Planning Project (CEPP) is a CERP project. CEPP is the product of a state-federal partnership, and the costs are shared between the Corps and SFWMD. J.A.564. Authorized by Congress in 2016, and then amended in 2018 and 2020 to include the challenged project features, CEPP is designed to restore the central portion of the Everglades ecosystem by capturing water from Lake Okeechobee that would otherwise be lost to tides and redirecting it south to the Everglades and Florida Bay. J.A.583; J.A.724.

The Everglades Agricultural Area phase of CEPP consists of two main components, which collectively make up "the project": 1) a 10,500-acre, above-ground reservoir with a storage capacity of 240,000 acre-feet of water,[1] and 2) a 6,500-acre stormwater-treatment area. J.A.611-12. To expedite the implementation of CERP, the Department of the Interior purchased a tract

---

[1] An acre-foot of water is about 326,000 gallons, or the amount of water needed to flood an acre of land one-foot deep.

of land in the Everglades Agricultural Area, downstream of Lake Okeechobee. J.A.865. The reservoir and treatment area are being built on that land to supply water to Everglades National Park. *Id.*

The project achieves its ecosystem-restoration purpose in part by reducing undesirable releases of water to the northern estuaries and instead sending clean water to the Everglades. J.A.589-91. Nutrient-laden freshwater released from Lake Okeechobee to the northern estuaries can damage the ecology of south Florida, leading to significant economic losses in commercial fishing, recreation, tourism, and real estate. *Id*. The ecological effects, which included miles of toxic algae blooms, became so dire that the state of Florida declared an emergency in 2017 and directed SFWMD to pursue an expedited process to reduce the undesirable releases by providing increased storage and treatment capacity in the Everglades Agricultural Area. J.A.589.

The stormwater-treatment area is a crucial aspect of the project. It is responsible for treating water and removing phosphorus before it is sent south to the Everglades. The treatment area consists of man-made wetlands that naturally reduce phosphorus concentrations in the outflows. *See* J.A.1055. The reservoir is designed to store newly captured freshwater that

would otherwise be lost to the Atlantic Ocean and the Gulf of Mexico through the northern estuaries. J.A.851. Working together, the reservoir and the treatment area aim to improve "the quantity, quality, timing and distribution of water flows to central Everglades . . . while increasing water supply for municipal, industrial, and agricultural users." J.A.860.

In 2018 and 2020, Congress authorized the reservoir and stormwater-treatment-area project. Pub. L. No. 115-270, § 1308(a), 132 Stat. 3877 (2018), *modified by* Pub. L. No. 116-260, § 324, 134 Stat. 2736 (2020). In 2021, the Corps and SFWMD entered a cost-sharing agreement that governs, among other things, the construction of the reservoir and the stormwater-treatment area. J.A.710. As of this writing, the treatment area is nearly constructed, but the required wetland vegetation has not all grown in. *See We Did It!*, South Florida Water Management District (Feb. 22, 2023), https://perma.cc/GX48-E7WU. Construction of the 240,000-acre-foot reservoir is also underway, and the Corps anticipates it will be completed by 2030. *See Integrated Delivery Schedule 2022 Update*, U.S. Army Corps of Engineers, https://perma.cc/M8JL-3NS5 (last visited Nov. 12, 2023).

The two components of the project, labelled A-2 STA (stormwater-treatment area) and A-2 Reservoir, are shown below.



J.A.852. The following map depicts the Everglades Agricultural Area in relation to the Lake and the broader south Florida. The project is being built in a part of the Everglades Agricultural Area to hold water that would otherwise flow out of the Lake through the St. Lucie and Caloosahatchee estuaries (northern estuaries) mapped below.



J.A.563.

### 2. Studies and permitting

*Savings Clause.* The Corps' Savings Clause analysis concluded that the proposed project will not eliminate or transfer an existing source of water for agricultural users. J.A.941. Rather, the analysis showed that the project *increases* the water supply for existing Lake Okeechobee water users compared to existing conditions. J.A.938 ("The severity, duration, and magnitude of water supply shortages for existing legal users decrease with the project.").

*NEPA.* The Corps prepared an EIS under NEPA that evaluates the environmental effects of the operation of the reservoir and the stormwater-treatment area. J.A.842. Notice of the final EIS's availability was published in the Federal Register in January 2020. J.A.853.

*Permits and approvals.* The Corps issued a permit to the SFWMD to construct the stormwater-treatment area under Clean Water Act Section 404 and Section 10 of the Rivers and Harbors Act of 1899 (404 permit). J.A.471; J.A.499-504; J.A.516-46. The permit allows only construction of the treatment area and a limited "operational testing and monitoring period," which "is considered part of the construction phase and includes inundating the cells of the [stormwater-treatment area] to facilitate vegetation grow-in." J.A.549.

The permit does *not* authorize operation of the stormwater-treatment area.

Pursuant to Special Condition 14 of the permit:

> The Permittee shall not operate the [stormwater-treatment area] beyond what is described in the project description until written authorization is granted by the Corps subject to a future permit evaluation and modification and a National Pollutant Elimination System (NPDES) permit [under the Clean Water Act] has been received. A minimum of six months prior to planned operation of the facility, the Permittee shall submit an operation plan to the Corps for review and approval. The National Environmental Policy Act analysis for the project will be updated to reflect the operations plan and coordinated for public and agency review as appropriate.

J.A.479.

*408 Permit.* The Corps also approved SFWMD's request to construct the stormwater-treatment area pursuant to Section 14 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 408 (408 approval). The 408 approval likewise authorized only construction activities, not operation of the stormwater-treatment area. Specifically, the 408 approval requires a Corps Water Control Plan that includes operational criteria for the inflow/outflow canal and pump station before those features can be used for routine operational purposes. J.A.522. The Corps required that, during limited grow-in operations, SFWMD "shall ensure the capability to manage water levels within the Inflow-Outflow canal and/or the parallel seepage canal to

ensure adjacent landowners are not adversely impacted per CERP Savings Clause requirements, including capability to deploy temporary pumps when needed." *Id*. The Corps then modified the 404 permit to require SFWMD to adhere to the terms of the Section 408 approval. J.A.517.

### C. Proceedings below

Plaintiffs—two sugar corporations and a sugar growing cooperative—challenged the Corps' approval of the project in federal district court under the Administrative Procedure Act (APA), claiming that the Corps violated WRDA's Savings Clause and NEPA. The Corps moved to dismiss for lack of standing. J.A.58. The district court determined that Plaintiffs' allegations sufficed for the pleadings stage and denied the motion. J.A.163-87.

The parties then cross-moved for summary judgment, and the district court granted the Corps' motion. The district court concluded that the Corps did not violate WRDA's Savings Clause because that provision applies only to water lost "as a result of implementation of the Plan." J.A.1401 (quoting WRDA § 601(h)(5)(A)(i)). Because the 2008 regulation schedule, not the project, lowered the Lake level, the court reasoned that the project did not violate the Savings Clause. J.A.1419.

The district court also concluded that, given the "broad discretion that agencies are given as to *when* they perform a NEPA analysis," the Corps did not violate NEPA when it analyzed the stormwater-treatment area in tandem with the reservoir. J.A.1423. Given the Corps' commitment to conduct a NEPA analysis before authorizing standalone operations of the stormwater-treatment area, the court held that an EIS was not yet required. *Id.*

## SUMMARY OF ARGUMENT

The district court correctly concluded that the Corps' approval of the project did not violate WRDA's Savings Clause or NEPA.

At the threshold, Plaintiffs lack standing to challenge the Corps' compliance with the statutory provisions because Plaintiffs fail to identify any causal link between the challenged project and their asserted water-supply injury. Plaintiffs do not have standing to challenge a project that *improves* their water supply simply because the Corps might authorize a project with greater water-supply benefits if the Corps used a different Savings Clause baseline. Put another way, a judgment that the project is unlawful would not redress their asserted injury. The same is true of Plaintiffs' NEPA claim. Plaintiffs challenge the analysis and approvals for

project construction even though their asserted injury is not traceable to construction. Rather they assert that standalone operations of the stormwater-treatment area *could* reduce their water supply *if* authorized. Like with Plaintiffs' WRDA claim, Plaintiffs do not connect any reduction in water supply to the challenged NEPA decision or demonstrate how a judgment in their favor would redress their injuries.

Even if Plaintiffs had standing, the Corps did not violate WRDA's Savings Clause because the project does not eliminate or transfer any existing source of water. Plaintiffs erroneously read the Savings Clause to require the Corps to make up for losses of water caused by intervening events, ignoring the plain statutory language instructing that the Corps must only ensure that water is not lost "as a result of implementation of the Plan."

Nor did the Corps violate NEPA by analyzing the environmental effects of the project as it was contemplated and authorized by Congress—with the reservoir and stormwater-treatment area operating in tandem. Standalone operation of the treatment area, which Plaintiffs argue should have been analyzed, had not been proposed and therefore would have been too speculative for the Corps to discuss in the EIS. If standalone operations are eventually authorized, the Corps will first conduct a NEPA analysis with

the benefit of a concrete proposal. It is reasonable and consistent with NEPA for the Corps to wait to conduct an analysis for those operations until it has a concrete proposal.

This Court should affirm the decision below or instruct the district court to dismiss for lack of standing.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo, using the same standard applied by the district court—the APA's arbitrary or capricious standard of review. *United States v. Schwarzbaum*, 24 F.4th 1355, 1363 (11th Cir. 2022). The APA directs courts to uphold an agency's decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## ARGUMENT

## I. Plaintiffs lack standing.

The "'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable

judicial decision." *Id.* As the party invoking federal jurisdiction, Plaintiffs must identify facts that establish each element for each claim they bring. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

## A. Plaintiffs do not demonstrate standing for their WRDA claim.

To establish standing, Plaintiffs must show (1) that they were concretely injured (2) by the Corps' approval of the project, and (3) the Court's judgment is likely to redress that injury. Plaintiffs assert that the Corps used the wrong "baseline" when conducting the Savings Clause analysis for the project. *See, e.g.*, U.S. Sugar Br. at 19. But a general objection to an agency's procedures does not establish standing. *See Lujan*, 504 U.S. at 572-77 (interest in seeing lawful procedures followed alone is insufficient to confer standing); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (explaining the "now-familiar admonition that alleging a 'bare procedural violation, divorced from any concrete harm' is not enough to support standing" (quoting *Spokeo*, 578 U.S. at 338)).

Plaintiffs assert that they have been concretely injured because they face a lower water supply than was available in 2000. But any reduction in water supply is not traceable to the challenged project. The project *increases*

water supply. Its 78-billion-gallon reservoir of new water protects agricultural water supply by reducing the likelihood of water shortages in dry months. J.A.938 ("The severity, duration, and magnitude of water supply shortages for existing legal users decrease with the project."); J.A.842.

So Plaintiffs' argument boils down not to a claim that this project causes them harm, but to an argument that, if the Corps followed the "correct" procedures, Plaintiffs might gain *more* water. The Supreme Court recently addressed a similar claim in *Department of Education v. Brown*, 600 U.S. 551 (2023). There, a student-loan borrower, who was eligible for $10,000 in loan forgiveness, rather than the maximum $20,000, argued that the loan-forgiveness plan was unlawful because it was enacted without proper procedures. *Id.* at 559. The Supreme Court held that even though the borrowers could conceivably obtain more loan forgiveness if the Department followed their preferred process, the borrowers did not have standing to challenge the plan because they could not establish that any injury suffered was fairly traceable to the plan. *Id*. at 561.

Like in *Brown*, Plaintiffs' fundamental claim is that the project is unlawful because the agency did not follow the proper process. And their asserted injury is, oddly, that they are not *more* affected by the project

because the project could provide them more water. As the Supreme Court explained in *Brown*: "It would be quite strange to think that a party experiences an Article III injury by not being affected by an unlawful action . . . or not being more affected by such action . . . ." *Id.* at 564.

The causation flaw also betrays a redressability problem. After all, causation and redressability are two sides of the same coin. *See* Wright & Miller, *Federal Practice and Procedure* § 3531.5 (3d ed. 2023). On the redressability side, a judgment finding the project unlawful would in no way redress Plaintiffs' claimed injury. Vacating the project, as U.S. Sugar requests in its opening brief after waiving the request below,[2] would not improve Plaintiffs' water supply.

---

[2] Plaintiffs waived their request for vacatur at the summary judgment hearing. *See* J.A.1481-82 ("We have made so clear that we are not trying to stop construction of the STA or the reservoir . . . . There is nothing inherently wrong with the reservoir and the STA for water supply . . ."); *see also* J.A.1486 ("It is, of course, reassuring to the Corps to hear today that none of the Plaintiffs are seeking vacatur of any of the decisions at issue in today's case."). That is why the district court opinion explains that "Plaintiffs do not seek vacatur of the projects." J.A.1396. On appeal, Plaintiffs have not disputed the district court's characterization of the relief they sought. Plaintiffs cannot now revive their request for vacatur, U.S. Sugar's attempt notwithstanding. *See United States v. Garcia-Sandoval*, 703 F.3d 1278, 1282 (11th Cir. 2018) ("Arguments that are waived before the district court may not be reviewed on appeal.").

"Procedural-standing cases" and their loosening of the redressability inquiry do not help Plaintiffs. Those cases simply hold that the uncertain connection between process and substantive decisionmaking does not preclude standing. In *Lujan*, for example, the Supreme Court noted that a landowner adjacent to a proposed dam would have "standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld." 504 U.S. at 572 n.7. "While it might be uncertain whether undertaking an environmental impact statement would prevent the dam from being built, it is clear that building the dam would directly injure the landowner." *Brown*, 600 U.S. at 566. Similarly, it might be uncertain how public comments would affect a particular land-management decision, but there would be no uncertainty that a plaintiff with concrete plans to observe nature in the affected area would be injured if the project went forward. *See id.* (describing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)).

Here, by contrast, Plaintiffs cannot show that the project causes their asserted injury, only that a different process might yield an even better outcome. Plaintiffs may hope that if the Court were to agree with their

interpretation of the Savings Clause, the Corps would be persuaded to rethink its analysis and reconfigure the project to provide more water. But "[r]edressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring). The simple fact is that the project Plaintiffs have challenged does not cause them harm, so a court order finding that project unlawful would not provide Plaintiffs redress.

## B. Plaintiffs do not demonstrate standing for their NEPA claim.

Plaintiffs assert a second procedural grievance—that the Corps violated NEPA's "anti-segmentation principles" by jointly analyzing the environmental effects of the treatment area and reservoir. Once again, their claimed concrete injury (loss of water supply) is not caused by the Corps' decision to approve the project.

Plaintiffs argue that the NEPA analysis that supported the approval of the reservoir and stormwater-treatment area should have considered the independent operation of the treatment area without the reservoir. But the approval does not authorize the standalone operations that Plaintiffs fear

will threaten their water supply and therefore causes Plaintiffs no harm. Seen through another lens, Plaintiffs are not imminently injured by as-yet-unauthorized standalone operations. *See, e.g., United States v. Texas,* 599 U.S. 670, 686 (2023) (Gorsuch, J., concurring) (setting forth alternative means of "diagnos[ing] the jurisdictional defect").

Presently, only construction and shallow-water plant growth are authorized. J.A.472; J.A.434. Plaintiffs do not assert that those phases cause them injury. After all, the water needed to grow the vegetation is already allocated to the acreage and was previously used to grow crops on the project footprint. J.A.868-69; J.A.900; *see also* Dkt.65 at 9 (including complete accounting of water allocation). Plaintiffs do not object to that authorization, only the potential future operation of the stormwater-treatment area on a standalone basis.

Standalone operations cannot occur until the Corps revises its draft project operating manual to include those operations and until the operations are authorized by a Corps regulatory permit (or permit modification). The Corps' current permit authorizes only the construction of the stormwater-treatment area and associated infrastructure, including the

grow-in period. The permit does not authorize operation of the treatment

area after the grow-in period. Special Condition 14 makes that quite clear:

> Operations: The Permittee shall not operate the [stormwater-treatment area] beyond what is described in the project description until written authorization is granted by the Corps subject to a future permit evaluation and modification and a National Pollutant Elimination System (NPDES) permit has been received. A minimum of six months prior to planned operation of the facility, the Permittee shall submit an operation plan to the Corps for review and approval. The National Environmental Policy Act analysis for the project will be updated to reflect the operations plan and coordinated for public and agency review as appropriate.

J.A.479. Several authorizations are therefore required before operation of the

treatment area may occur.

First, the Corps must update the project operating manual to include

post-grow-in operation. J.A.557; J.A.558; J.A.830; J.A.652. That update must

be supported by a NEPA analysis, including an opportunity for review and

public comment, and a Savings Clause analysis. J.A.557; J.A.945; *see also*

J.A.789 ("Development of the [project operating manuals] will be carried out

in a public process in accordance with NEPA and other applicable laws and

regulations."); J.A.762 (Savings Clause analyses "also apply to revisions to

Project Operating Manuals"). The Corps' permit to SFWMD for construction

of the stormwater-treatment area also requires the treatment area's features

be included in the Corps' Water Control Plan, which includes the project operating manual, or be separately approved as a deviation, before routine operations can proceed. J.A.479.

Second, the Florida Department of Environmental Protection must issue a permit under a state law—the CERP Regulation Act (CERPRA)—which regulates CERP components. The state department must also issue a National Pollution Discharge Elimination System (NPDES) permit under the federal Clean Water Act that covers the treatment area's interim operations. SFWMD has applied for a NPDES permit, and its application is pending. *See Permitting Applications with Event Details (Application Number FL0A00050-001-IW8B)*, Florida Department of Environmental Protection, https://perma.cc/TF2Y-WGDK (last updated Nov. 11, 2023).

Finally, before the treatment area can begin operations on an interim basis, the Corps must also modify the project's 404 permit. J.A.479. In considering that permit modification, the Corps will evaluate the environmental effects of standalone operation of the stormwater-treatment area under NEPA, the Clean Water Act, and, as appropriate, the Endangered Species Act. *See id.*; *see also, e.g.*, J.A.550 ("The Corps will evaluate whether it is appropriate to re-initiate [Endangered Species Act] Section 7 consultation

with the [U.S. Fish and Wildlife Service] at the time the applicant submits the request to operate the STA and the water quality certification issued by the [Florida Department of Environmental Protection]."); J.A.551 ("Once water quality certification is received for operations, the Corps will coordinate the [Florida Department of Environmental Protection] permit with EPA to determine whether impacts would occur to downstream jurisdiction.").

During the public NEPA process that must precede the issuance of a project operating manual and 404 permit modification, Plaintiffs would have a chance to comment on the potential effects of standalone operations on their water supply. And if that analysis led to a decision and standalone authorizations were authorized in a manner that harmed plaintiffs, they could then seek judicial review under the APA. *See* 5 U.S.C. § 704; *see also, e.g.*, *Baccarat Fremont Developers, LLC v. U.S. Army Corps of Eng'rs*, 425 F.3d 1150, 1153 (9th Cir. 2005).

But those steps have not yet been taken. Because the NEPA analysis and project approval does not authorize operation of the stormwater-treatment area, it does not cause Plaintiffs any harm. To the extent Plaintiffs fear they will be harmed if operations are approved, that harm does not stem

from the existing approval. Rather, it would, if at all, stem from future analysis and authorizations. "Mere conjecture about possible governmental actions" does not establish standing. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 420 (2013).

*   *   *

The Court should affirm and modify the district court's judgment on the alternative ground that the district court lacked Article III jurisdiction over Plaintiffs' claims. *See Boda v. United States*, 698 F.2d 1174, 1176-77 (11th Cir. 1983) (affirming dismissal of civil suit but modifying it so that it rested solely on the ground of lack of jurisdiction).

## II. The project complies with the Savings Clause because it does not eliminate or transfer an existing legal source of water.

### A. By its plain text, the Savings Clause applies only when the Corps eliminates or transfers existing water sources when implementing a CERP project.

If the Court concludes that the district court had jurisdiction, then the district court's judgment should be affirmed on the merits. In reviewing that judgment, this Court can begin and end its analysis with the statutory text. *See Heyman v. Cooper*, 31 F.4th 1315, 1318 (11th Cir. 2022). WRDA's Savings Clause prevents the Corps from implementing CERP projects in a manner

that eliminates or transfers existing water sources unless the Corps makes available another comparable source of water. The Savings Clause reads:

> Until a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act is available to replace the water to be lost as a result of implementation of the Plan [i.e., CERP], the [Corps] and [SFWMD] shall not eliminate or transfer existing legal sources of water [including agricultural water supply].

WRDA § 601(h)(5)(A).

Because the challenged project does not "eliminate or transfer" an existing legal source of water for agricultural users, it does not violate the Savings Clause. *See* J.A.939; J.A.971. The approved project—the reservoir and stormwater-treatment area—increases water supply compared to existing conditions. By constructing a reservoir capable of storing 240,000 acre-feet (around 78 billion gallons) of newly captured water and allowing for the return of water from the reservoir when excess capacity is available, the project substantially expands existing water supply, including for agricultural users. J.A.842; J.A.939.

For that reason, the Corps' Savings Clause analysis concluded that the "severity, duration, and magnitude of water supply shortages for existing legal users decrease with the project." J.A.938. In years with the largest water

supply shortages, the project is expected to meet additional water demands. *Id*. Because the project increases water supply compared to existing conditions, it does not "eliminate or transfer" any "existing legal sources of water," and the Savings Clause does not preclude the Corps from implementing the project.

Plaintiffs have not meaningfully challenged the validity of that hydrologic analysis. While they concede that the reservoir will add 250,000 acre-feet of water storage, they argue that because the 2008 regulation schedule lowered maximum lake levels by about 500,000 acre-feet, the project does not sufficiently make up for water lost in the 2008 schedule. U.S. Sugar Br. at 26. In other words, Plaintiffs contend that it is insufficient for the Corps to add 250,000 acre-feet of storage. Instead, in Plaintiffs' view, the Corps' project must add at least 500,000 acre-feet to comply with the Savings Clause.

Plaintiffs' interpretation, however, diverges from the Savings Clause's plain language, which provides simply that the Corps "shall not eliminate or transfer existing legal sources of water" in implementing CERP projects. WRDA § 601(h)(5)(A)(i). Nothing in the CERP Savings Clause requires the Corps to recoup water supply lost due to other non-CERP events. At bottom,

Plaintiffs' reading conflates a command not to *eliminate* water with a command to *provide* water.

In addition to being inconsistent with the plain meaning of "eliminate or transfer," Plaintiffs' interpretation ignores key language. Plaintiffs rewrite the Savings Clause to read:

> Until a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act is available ~~to replace the water to be lost as a result of implementation of the Plan~~, the Secretary and non-Federal sponsor shall not eliminate or transfer existing legal sources of water.

WRDA § 601(h)(5)(A)(i). The Court should "disfavor an interpretation when that interpretation would render a clause, sentence, or word superfluous, void, or insignificant." *Fuerst v. Hous. Auth. of Atlanta*, 38 F.4th 860, 869 (11th Cir. 2022) (cleaned up). The statute is clear that the need to identify a new source of water applies only if the Plan's implementation *caused* the loss of water—that is, when water is "lost as a result" of the CERP project. *See* WRDA § 601(a)(4) (defining the "Plan" as "the Comprehensive Everglades Restoration Plan"). Thus, the statutory text does not require restoration to a 2000 baseline where the CERP project's implementation does not result in a water-supply reduction compared to conditions without the project.

**B.    WRDA's legislative history, statutory history, and implementing regulations confirm the Savings Clause's plain meaning.**

The language of the Savings Clause is plain on its face that Congress intended to limit its prohibition on the "eliminat[ion] or transfer" of "existing legal sources of water" to water that is "lost as a result of" CERP's implementation. WRDA's legislative history confirms that interpretation. Specifically, the Senate report reiterates what the Savings Clause already makes clear:

> [The Savings Clause] states that the Secretary shall ensure that the implementation of the Plan, including physical or operational modifications to the C&SF Project, does not cause significant adverse impact on existing legal water users.

S. Rep. No. 106-362, at 53 (2000). Thus, as already explained, the Clause focuses on whether implementing CERP adversely affects existing water users. Because the challenged project reduces water shortages for agricultural users, it does not have such adverse effects.

Comparing the text of the Savings Clause to the language Congress used in other WRDAs further undermines the notion that the Savings Clause obligates the Corps to maintain a particular level of water supply regardless of intervening events. For example, in WRDA 1988, Congress directed the

Army Corps "to maintain water levels in the Mississippi River headwaters reservoirs within the following operating limits: Winnibigoshish 1296.94 feet—1303.14 feet; Leech 1293.20 feet—1297.94 feet . . ." WRDA 1988, Pub. L. No. 100-676, § 21(a), 102 Stat 4012 (1988). If Congress wanted to set a fixed baseline, it "easily could have drafted language to that effect." *Mississippi ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 169 (2014). When Congress could have "used language similar to what it used" in analogous statutes but did not, that is good evidence that Congress did not intend the same result. *Boumediene v. Bush*, 553 U.S. 723, 776-77 (2008).

The Corps' regulations likewise reaffirm the plain-text reading of the statute. The regulations repeatedly state that a Savings Clause analysis is required only for an "elimination or transfer" of "legal sources of water" that results from project implementation. 33 C.F.R. § 385.36. The regulations are emphatic that the Savings Clause does not require the Corps to make up for reductions in water caused by other, non-CERP, actions. *Id*. The final draft guidance memoranda are also in accord: "The Savings Clause only applies to changes from the date of enactment of WRDA 2000 that result from 'implementation of the Plan.'" J.A.758. Non-CERP activities (like changes in regulation schedule) are expressly listed in the guidance as intervening

factors that can change hydrological conditions and therefore change the Savings Clause analysis. *Id*.

Plaintiffs' real grievance seems to be with the Lake's 2008 regulation schedule, which lowered Lake levels to facilitate dike repairs. But Plaintiffs are not challenging that regulation schedule, and any challenge would be barred by the general six-year statute of limitations for claims filed against the United States. *See* 28 U.S.C. § 2401(a). Moreover, as the district court thoroughly explained, the regulation schedule is not a CERP project and thus is not subject to the Savings Clause. *See* J.A.1404-19. Because Plaintiffs do not identify how the challenged CERP project eliminates or transfers an existing source of water, their Savings Clause argument fails.

## C. Plaintiffs' contrary arguments lack merit.

Even though the Corps' regulations repeatedly stress that the Savings Clause applies only when implementation of CERP projects *causes* an elimination or transfer, Plaintiffs insist that the regulations require the Corps to compare water levels in 2000 to water levels available after the project is implemented. Plaintiffs' interpretation, however, incorrectly assumes that if water levels are lower than 2000 water levels after project implementation, the project must have caused lower water levels. That interpretation rests on

a fallacy because it refuses to account for the possibility of intervening events that may alter pre-CERP baseline conditions compared to 2000 water levels. J.A.758-59.

Reading the Corps' regulations to recognize the consequences of intervening events is consistent with the Corps' subsequent guidance and the statutory text, both of which require the Corps to consider only "water to be lost as a result of implementation of the plan." WRDA § 601(h)(5)(A). The Court should interpret the regulations in a manner consistent with the statute to require only an analysis of water lost because of the plan's implementation. *See Sec'y of Lab., Mine Safety & Health Admin. v. W. Fuels-Utah, Inc.*, 900 F.2d 318, 320 (D.C. Cir. 1990) (courts "must construe regulations in light of the statutes they implement" (cleaned up)).

Plaintiffs' assertion that the Savings Clause establishes a fixed "statutory baseline" is similarly unsupported by the statute or the regulations. U.S. Sugar considers an 18.53-foot Lake level to be the "statutory

baseline."[3] U.S. Sugar Br. at 9. But nothing in the statute sets that baseline—or any fixed numerical baseline. Indeed, Lake Okeechobee's water very rarely reaches such a high level. A Lake level of 18.53 feet was the single daily maximum level observed when the Corps managed the Lake under the prior regulation schedule. J.A.1214. And the frequency of water levels above 18 feet was well below 1% of the period of record based on a review of a 36-year model. *See* J.A.1216-28. In fact, maintaining Lake levels at 18.53 feet would have led to a 55% probability of the Herbert Hoover Dike breaching. J.A.1213. It is implausible that Congress required the Corps in the Savings Clause to permanently maintain the Lake at that dangerous and unsustainable level. *See South Carolina v. United States Army Corps of Eng'rs*, 66 F.4th 189, 194, 197 (4th Cir. 2023) (rejecting an interpretation of a statute

_____

[3] Plaintiffs have generally adopted the arguments in one another's briefs, but the meaning of pre-CERP baseline appears to be an area of disagreement. U.S. Sugar argues that the pre-CERP baseline is 18.53 feet, whereas Okeelanta states that "the pre-CERP baseline does not represent a fixed quantity of water but rather is the amount of water that would be available under different rainfall conditions if the facilities and operational rules in existence in 2000 remained in effect." Okeelanta Br. at 26. To avoid mischaracterizing any nuances in Plaintiffs' arguments, we refer only to U.S. Sugar here.

that would require the Corps to permanently maintain a specific water level as "absurd").

Not only is the premise that the Savings Clause sets a single fixed Lake level misguided, but it is doubly incorrect to presume that Congress intended to fix the baseline at 18.53 feet given that the Lake level on the date of enactment of WRDA (December 11, 2000) was 11.42 feet, not 18.53 feet. *See National Water Information System*, U.S. Geological Survey, https://perma.cc/HA95-VVR4 (last updated Nov. 12, 2023). The Court should thus reject Plaintiffs' statutorily unmoored and impractical definition of "pre-CERP baseline."

Plaintiffs' argument that the "backdrop of WRDA" supports their fixed-baseline interpretation is equally unavailing. U.S. Sugar Br. at 25. Although Plaintiffs are correct that the adoption of CERP required compromise, their contentions about the precise nature of that compromise are unsupported. For example, U.S. Sugar notes that "[t]he Restudy acknowledges that the parties who prepared CERP managed to arrive at a 'consensus' only after agreeing that Plan projects would not reduce the then-current Lake Levels. J.A.1023." U.S. Sugar 24. But the "consensus" described in the cited pages does not once mention maintaining a fixed Lake level. *See*

J.A.1023-28. Instead, consistent with the Corps' understanding of the Savings Clause, it notes that: "It is an important principle that has helped gain consensus for the Restudy that human users will not suffer from the environmental restoration provided by the Restudy." J.A.1023. The environmental restoration project approved here does not harm water supply and therefore does not violate the Savings Clause or conflict with its background principles.

If anything, the backdrop of WRDA shows that Congress does not share Plaintiffs' concerns about Savings Clause compliance for this project. Congress is closely involved with CERP projects—enacting a new WRDA every two years and authorizing all major changes to CERP projects, including this one. If Congress thought that the project violated the Savings Clause, it could have declined to authorize the project or appropriate funds. Congress was provided the Savings Clause analysis in the Central Everglades Planning Project Post Authorization Change Report, Feasibility Study and Draft Environmental Impact Statement, and Congress expressly referenced that report when authorizing the project in 2018. Pub. L. No. 115-270, § 1308(a). If Congress believed that the Savings Clause analysis in that report was faulty for failing to use the correct baseline, it could have declined

to authorize the project or directed the Corps to correct the Savings Clause analysis.

Congress had another opportunity to correct any Savings Clause deficiencies in 2020 when it again modified CEPP to include the project. Pub. L. No. 116-260, § 324. In 2022, Congress again requested an update on CERP projects and the Lake Okeechobee Regulation Schedule but expressed no concerns about the Savings Clause. Pub. L. No. 117-263, § 8217, 136 Stat. 2395 (2022). The context of Congress's close involvement in authorizing and overseeing CERP projects thus provides additional support for upholding the Corps' Savings Clause analysis.

### D. Any error in the Corps' Savings Clause analysis would be harmless.

Even if Plaintiffs were correct that the Corps did not apply the correct baseline in its Savings Clause analysis, WRDA and its implementing regulations do not categorically bar elimination or transfer of existing water sources. Instead, WRDA simply requires the Corps to "ensure[] that such elimination or transfer shall not occur until a new source of water of comparable quantity and quality is available to replace the water to be lost as a result of implementation of the Plan." 33 C.F.R. § 385.36(a); *see also* U.S.

Sugar Br. at 23. So even under Plaintiffs' theory, the Corps may "eliminate or transfer" water so long as the Corps replaces the water lost as a result of the project. Because undisputedly zero water is lost *as a result of* the project, any failure to apply the correct baseline to the elimination-or-transfer determination is at most harmless error. *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007) (describing harmless error rule).

*        *        *

The text, regulations, legislative history, and statutory history all require the same conclusion: The Corps complied with the Savings Clause when it approved the project.

## III. The Corps fully complied with NEPA when considering and approving the project.

As a threshold matter, the Corps was not required to analyze standalone operation of the stormwater-treatment area for the simple reason that the Corps did not authorize standalone operations. *See generally* Part I.B, *supra*; *see also Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004) (finding that the causal relationship between the agency action and the environmental effect was insufficient to require NEPA analysis). Before

standalone operations can be approved, the Corps would need to either supplement the EIS or conduct a new NEPA analysis. *See* 40 C.F.R. § 1502.9; *see also* Part I.B, *supra*. NEPA contemplates that an agency will prepare an EIS (when one is required) before making "any irreversible and irretrievable commitments of resources." *See* 42 U.S.C. § 4332(C)(v). Because multiple federal authorizations are still required before the treatment area could operate on a standalone basis, there has been no irretrievable commitment to operating the treatment area independently. *See, e.g.*, *Sierra Club v. Peterson*, 717 F.2d 1409, 1415 (D.C. Cir. 1983) (holding that an EIS was not required before the government issued a mineral lease when the agency reserves "both the authority to *preclude* all activities pending submission of site-specific proposals and the authority to *prevent* proposed activities if the environmental consequences are unacceptable"); *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 49 (D.C. Cir. 1999) ("the point of irreversible and irretrievable commitment of resources and the concomitant obligation to fully comply with NEPA do not mature until leases are issued"). At bottom, Plaintiffs prematurely challenge a potential future NEPA analysis for as-yet-unauthorized standalone operations. But they fail to identify any

flaw in the existing analysis and approval for the project as presently authorized.

Plaintiffs' argument that that Corps' existing NEPA analysis for the project violated "anti-segmentation" principles lacks merit. Anti-segmentation principles establish that an agency may need to consider the environmental effects of multiple proposals together in a single EIS when those proposals "are pending concurrently before an agency" and "will have cumulative or synergistic environmental impact upon a region." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976); *see also* 40 C.F.R. § 1508.25 (2020). But Plaintiffs have not shown that a proposal to operate the treatment area on a standalone basis was pending before the agency concurrently with the project or that standalone operation of the stormwater-treatment area will have cumulative environmental impacts.

First, a proposal to operate the stormwater-treatment area on a standalone basis was not pending before the Corps when it was considering the project. That is why the NEPA analysis supporting the project did not evaluate impacts from standalone operation: those impacts were "outside the scope of this current Final EIS." J.A.851. If standalone operations were

later proposed, the Corps explained, those environmental impacts "would be analyzed under supplemental NEPA reviews." *Id*.

Agencies are not normally required to analyze the environmental impacts of projects that have not yet been proposed. And for good reason. Without a concrete plan, "investigators and researchers would be forced to analyze the environmental impact of a project, the parameters and specifics of which would be a mere guess. This result contravenes the NEPA purposes of providing the agency and the public with accurate and relevant information." *City of Oxford v. FAA*, 428 F.3d 1346, 1356 (11th Cir. 2005). As the Court in *City of Oxford* noted, if an agency later receives a proposal that will have cumulative impacts with the approved project, the agency can analyze those impacts when considering the later proposal. *Id.* at 1356 n.23.

Waiting until actions are actually proposed comports with the "rule of reason" inherent in NEPA and its implementing regulations, which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process. *Public Citizen*, 541 U.S. at 767; *see also Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1215 (11th Cir. 2012) (NEPA analysis of construction projects listed in a long-range plan would be speculative and

thus was not required); *City of Boston Delegation v. FERC*, 897 F.3d 241, 252-53 (D.C. Cir. 2018) (agency would have substantially overstated the environmental impact of a subsequent project if it had attempted to analyze the project at an earlier time, because the project was subsequently significantly curtailed).

Second, Plaintiffs fail to identify any synergies between the two proposed NEPA analyses that would require the Corps to combine them. Unlike the anti-segmentation cases that Plaintiffs cite, standalone operation of the stormwater-treatment area is not a necessary and inseparable part of the approved project. The project can operate as approved—with the reservoir and the stormwater-treatment facilities operating in tandem—even if standalone-treatment-area operations are never approved. In that case, the stormwater-treatment area could remain in a grow-in condition until the reservoir is completed. Because standalone operations are not a required component, there is no segmentation problem with the Corps' analysis. *Cf. Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1317-18 (D.C. Cir. 2014) (holding that the Federal Energy Regulatory Commission was not justified in rejecting commenters' requests that the agency consider the upgrade of an entire pipeline in one NEPA analysis, where the commenters had pointed

out that sequential pieces of pipeline "were, in fact, creating a complete, new, linear pipeline").

Plaintiffs do not identify any meaningful difference between analyzing standalone operations together with the reservoir and treatment-area project approval and analyzing standalone operations separately once they are proposed. The anti-segmentation principle does not exist simply to require the Corps to include NEPA analysis in one document instead of two. Its purpose is to prevent agencies from evading NEPA review by breaking projects down into environmentally insignificant parts that can be considered in a less robust analysis (such as an environmental assessment or finding of no significant impact) rather than an EIS. *Lowman v. FAA*, No. 21-14476, 2023 WL 6632725, at *11 (11th Cir. Oct. 12, 2023) (segmentation claim fails where petitioner failed to show that the agency broke apart related projects "to avoid a more onerous environmental review"); *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987) ("The rule against segmentation was developed to [e]nsure that interrelated projects the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions."). The Corps has not evaded environmental review. It conducted a detailed EIS for the project and will consider all

environmental effects, including any cumulative impacts in any future consideration of standalone treatment area operations.

Finally, Plaintiffs assert that the promise to do additional NEPA analysis is simply a post-hoc rationalization, claiming that "the Corps initially made no representation in the litigation below that it would analyze the standalone operation of the STA under NEPA" but "materially changed its position" at oral argument. U.S. Sugar Br. at 65 (quoting J.A.1422). That is simply false. *See* MSJ, J.A.1316 ("Actual operation of the STA is not allowed, and cannot be allowed until after additional permits are sought and additional Savings Clause/NEPA analysis performed.").[4]

---

[4] *See also* MTD, J.A.83 ("It is possible that the STA will become operational before the reservoir comes on line. But, if so, any post grow-in operations that are covered by the DA Permit will be the subject of future analyses, under NEPA and the Savings Clause, and updated operations plans."); MTD Reply, J.A.130 ("SFWMD can't operate the STA—either as a stand-alone feature or in tandem with the A-2 Reservoir—until it is authorized under a Corps regulatory permit (or permit modification) and the Corps revises its Draft POM. The Corps would support both of those actions with NEPA analysis, and any Draft POM revision would need to document its consistency with Savings Clause requirements."); MSJ Reply, J.A.1381 ("the Corps will not approve [standalone] operations without ensuring compliance with NEPA, the Savings Clause, and other applicable requirements"); Hearing Tr., J.A.1484 ("The Corps has committed that [SFWMD] . . . cannot go further with any additional construction or operation of the STA, the stormwater treatment facility, without the additional NEPA and Savings Clause analysis.").

The Corps has consistently committed to conduct additional NEPA analysis before standalone operations are authorized, if they are to be authorized at all. The record of decision for the stormwater-treatment-area permit requires that SFWMD submit an operations plan at least six months before operations commence, and it plainly states that "National Environmental Policy Act analysis for the project *will be updated* to reflect the operations plan and coordinated for public and agency review as appropriate." J.A.456 (emphasis added). The 404 permit contains an identical provision. J.A.479; *see also* J.A.482-83. The Corps remains committed to conduct additional NEPA analysis before authorizing standalone operations of the stormwater-treatment area. Its decision not to do so until those authorizations are proposed was not arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, this Court should affirm the judgment of the district court or modify it to dismiss for lack of standing.

Respectfully submitted,

s/ *Arielle Mourrain Jeffries*
TODD KIM
*Assistant Attorney General*
ALLEN M. BRABENDER
PETER KRYN DYKEMA
ARIELLE MOURRAIN JEFFRIES
*Attorneys*
Environment & Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3140
arielle.jeffries@usdoj.gov

November 2023
90-1-4-16441

# CERTIFICATE OF COMPLIANCE

1.     This document complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Rule 32(f), this document contains 10,180 words.

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2305 in 14-point Book Antiqua font.

s/ *Arielle Mourrain Jeffries*
ARIELLE MOURRAIN JEFFRIES

Counsel for Federal Appellees

# GLOSSARY[5]

## A

| | |
|---|---|
| ac-ft | Acre-feet |
| AM | Adaptive Management |
| ASA(CW) | Assistant Secretary of the Army for Civil Works |

## B

| | |
|---|---|
| BBCW | Biscayne Bay Coastal Wetlands |
| BCWPA | Broward County Water Preserve Areas |
| BMAP | Basin Management Action Plan |
| BMP | Best Management Practices |
| BO | Biological Opinion |

## C

| | |
|---|---|
| CE/ICA | Cost Effectiveness and Incremental Cost Analysis |
| CEM | Conceptual Ecological Model |
| CEPP | Central Everglades Planning Project |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CERP | Comprehensive Everglades Restoration Plan |
| CERPRA | Comprehensive Everglades Restoration Plan Regulation Act |
| Cfs | Cubic Feet Per Second |
| C&SF | Central and Southern Florida |
| COP | Combined Operating Plan |
| CSSS | Cape Sable seaside sparrow |
| CWA | Clean Water Act |

## D

| | |
|---|---|
| Decomp | Decompartmentalization and Sheetflow Enhancement Project |
| DMSTA | Dynamic Model for Stormwater Treatment Areas |
| DSAC | Dam Safety Action Classification |
| DOI | Department of Interior |
| DPOM | Draft Project Operation Manual |

---

[5] This brief avoids the use of acronyms where possible, but the subject area and record are heavily acronym laden. We provide this glossary to facilitate the Court's comprehension of the briefs and administrative records.

| | |
|---|---|
| DSMS | Dam Safety Modification Study |

E

| | |
|---|---|
| EAA | Everglades Agricultural Area |
| EARECB | Existing Condition Baseline |
| EARFWO | Future Without Project Baseline |
| EC | Engineering Circular |
| ECB | Existing Conditions Baseline |
| EDC | Engineering during construction |
| EFH | Essential Fish Habitat |
| EIS | Environmental Impact Statement |
| ENP | Everglades National Park |
| E.O. | Executive Order |
| EQ | Environmental Quality |
| ER | Engineering Regulation |
| EPA | Everglades Protection Area |
| ERTP | Everglades Restoration Transition Plan |
| ESA | Endangered Species Act |

F

| | |
|---|---|
| F.A.C. | Florida Administrative Code |
| F.S. | Federal Statute |
| FDEP | Florida Department of Environmental Protection |
| FEB | Flow Equalization Basin |
| FEIS | Final Environmental Impact Statement |
| FR/EIS | Feasibility Report/Environmental Impact Statement |
| FWC | Florida Fish and Wildlife Conservation Commission |
| FWO | Future Without Project Condition |

G

| | |
|---|---|
| GDM | General Design Memorandum |

H

| | |
|---|---|
| HEC-RAS | Hydrologic Engineering Center River Analysis System |
| HHD | Herbert Hoover Dike |
| HQUSACE | Army Corps Headquarters |
| HTRW | Hazardous, Toxic and Radioactive Waste |
| HU | Habitat Unit |

I

| | |
|---|---|
| IDC | Interest During Construction |
| IOP | Interim Operations Plan |

| | |
|---|---|
| IRL-S | Indian River Lagoon-South Project |
| IWR | Institute for Water Resources |

## L

| | |
|---|---|
| LEC | Lower East Coast |
| LECSA | Lower East Coast Service Area |
| LERR | Lands, Easements, Rights of Way, and Relocations |
| LNWR | Loxahatchee National Wildlife Refuge |
| LOOPS | Lake Okeechobee Operations Screening Model |
| LORS | Lake Okeechobee Regulation Schedule |
| LOSA | Lake Okeechobee Service Area |
| LOWRP | Lake Okeechobee Watershed Restoration Project |
| LTGM | Long-Term Geometric Mean |

## M

| | |
|---|---|
| M&I | Municipal and Industrial |
| MFL | Minimum Flows and Minimum Water Levels |
| mg/L | Milligrams Per Liter |
| MGD | Million Gallons per Day |
| MISP | Master Implementation Sequencing Plan |
| MOA | Memorandum of Agreement |
| MSL | Mean Sea Level |
| MRR | Major Rehabilitation Report |
| MWD | Modified Water Deliveries |

## N

| | |
|---|---|
| NED | National Economic Development |
| NEPA | National Environmental Policy Act |
| NER | National Ecosystem Restoration |
| NESRS | Northeast Shark River Slough |
| NGVD | National Geodetic Vertical Datum |
| NHPA | National Historic Preservation Act |
| NMFS | National Marine Fisheries Service |
| NNR | North New River |
| NNRC | North New River Canal |
| NOI | Notice of Intent |
| NPDES | National Pollutant Discharge Elimination System |
| NPS | National Park Service |
| NRHP | National Register of Historic Places |
| NRC | National Research Council |

| | |
|---|---|
| NRCS | Natural Resources Conservation Service |

O

| | |
|---|---|
| OIWW | Okeechobee Intercoastal Waterway |
| OMRR&R | Operations, Maintenance, Repair, Rehabilitation, and Replacement |
| OTMP | Operational Testing and Monitoring Period |

P

| | |
|---|---|
| PACR | Post Authorization Change Report |
| PDT | Project Delivery Team |
| PED | Preconstruction Engineering and Design |
| PET | Potential Evapotranspiration |
| PIR | Project Implementation Report |
| PPA | Project Partnership Agreement |
| ppb | Parts Per Billion |
| PWS | Public Water Supply |

R

| | |
|---|---|
| RDO | Rain Driven Operations |
| RECOVER | Restoration Coordination and Verification |
| RED | Regional Economic Development |
| RESOPS | Reservoir Sizing Operations Screening Model |
| ROM | Rough Order of Magnitude |
| RPM | Reasonable and Prudent Measure |
| RSM-BN | Regional Simulation Model for Basins |
| RSM-GL | Regional Simulation Model for the Glades and Lower East Coast Service Area |

S

| | |
|---|---|
| S&A | Supervision and Administration |
| SAD | South Atlantic Division of the Army Corps |
| SAJ | Jacksonville District of the Army Corps |
| SAV | Submerged Aquatic Vegetation |
| SDCS | South Dade Conveyance System |
| SFWMD | South Florida Water Management District |
| SHPO | State Historic Preservation Office(er) |
| SLR | Sea Level Rise |
| SPF | Standard Project Flood |
| SRS | Shark River Slough |
| STA | Stormwater-treatment Area |

## T

| | |
|---|---|
| TC | Terms and Conditions |
| THPO | Tribal Historic Preservation Office(er) |
| TMDL | Total Maximum Daily Load |
| TP | Total Phosphorus |
| TSP | Tentatively Selected Plan |
| TTNS | Tamiami Trail Modifications Next Steps |

## U

| | |
|---|---|
| USACE | United States Army Corps of Engineers |
| USDA | United States Department of Agriculture |
| USEPA | United States Environmental Protection Agency |
| USFWS | United States Fish and Wildlife Service |
| USGS | United States Geological Survey |

## W

| | |
|---|---|
| WCA | Water Conservation Area |
| WIIN Act | Water Infrastructure Investments for the Nation Act of 2016 |
| WMA | Wildlife Management Area |
| WPA | Water Preserve Areas |
| WQBELs | Water Quality-Based Effluent Limits |
| WRAC | Water Resources Advisory Commission |
| WRDA | Water Resources Development Act |
| WRRDA | Water Resources Reform and Development Act |
| WSE | Water Supply and Environmental Regulation Schedule |