Case No. 23-11683-H

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

UNITED STATES SUGAR CORPORATION,
OKEELANTA CORPORATION, and
SUGAR CANE GROWERS COOPERATIVE OF FLORIDA,

*Plaintiffs-Appellants*,

v.

UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Southern District of Florida
9:21-CV-81505 -DMM
(Consolidated Case)

# FINAL INITIAL BRIEF OF PLAINTIFF-APPELLANT
# OKEELANTA CORPORATION

T. Neal McAliley
David A. Karp
Carlton Fields, P.A.
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
(305) 530-0050
nmcaliley@carltonfields.com
dkarp@carltonfields.com

*Counsel for Plaintiff-Appellant
Okeelanta Corporation*

*U.S. Sugar Corp., et al. v. U.S. Army Corps of Engineers, et al.*
Case No. 23-11683-H

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Okeelanta Corporation submits this Certificate of Interested Parties and Corporate Disclosure Statement pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rule 26.1-1 through 26.1-3:

Bishop, Timothy S.

(Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

Booth, Colonel James L.

(Defendant-Appellee)

Brabender, Allen M.

(Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

Captains for Clean Water, Inc.

(Amicus in District Court)

Carlton Fields, P.A.

(Counsel for Plaintiff-Appellant Okeelanta Corp.)

Carpenter, Elizabeth Fata

(Counsel for Amici in District Court)

Clement & Murphy, PLLC

(Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

*U.S. Sugar Corp., et al. v. U.S. Army Corps of Engineers, et al.*
Case No. 23-11683-H

Clement, Paul D.

    (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

Coglianese, Matthew Patrick

    (Counsel for Plaintiff-Appellant Okeelanta Corp.)

Connor, Michael L.

    (Defendant-Appellee)

Dykema, Peter Kryn

    (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

Everglades Foundation, Inc.

    (Amicus in District Court)

Feeley, Matthew J.

    (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

Florida Bay Forever, Inc.

    (Amicus in District Court)

Florida Fruit & Vegetable Association

    (Amicus in District Court)

Florida Farm Bureau Federation

    (Amicus in District Court)

Florida Keys Fishing Guides Association, Inc.

    (Amicus in District Court)

*U.S. Sugar Corp., et al. v. U.S. Army Corps of Engineers, et al.*
Case No. 23-11683-H

Glass, Robert C.

> (Counsel for Amicus South Florida Water Management District)

Gunster, Yoakley & Stewart P.A.

> (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

Holtzman Vogel Baran Torchinsky & Josefiak, PLLC

> (Counsel for Plaintiff-Appellant Sugar Cane Growers Cooperative of
> Florida)

Hunter, Gary K.

> (Counsel for Plaintiff-Appellant Sugar Cane Growers Cooperative of
> Florida)

Interlandi, Lisa

> (Counsel for Amici in District Court)

Islamorada Chamber of Commerce, Inc.

> (Amicus in District Court)

Jazil, Mohammed O.

> (Counsel for Plaintiff-Appellant Sugar Cane Growers Cooperative of
> Florida)

Jeffries, Arielle Mourrain

> (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

*U.S. Sugar Corp., et al. v. U.S. Army Corps of Engineers, et al.*
Case No. 23-11683-H

Karp, David A.

> (Counsel for Plaintiff-Appellant Okeelanta Corp.)

Kelly, Colonel Andrew D.

> (Defendant-Appellee)

Kupfer, Avi M.

> (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

Lawrence, Andrew C.

> (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

Lomonico, Julia

> (Counsel for Amicus South Florida Water Management District)

Madden, Deborah K.

> (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

Matthewman, William

> (U.S. Magistrate Judge, Southern District of Florida)

Mayer Brown LLP

> (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

McAliley, T. Neal

> (Counsel for Plaintiff-Appellant Okeelanta Corp.)

Middlebrooks, Donald M.

> (U.S. District Judge, Southern District of Florida)

*U.S. Sugar Corp., et al. v. U.S. Army Corps of Engineers, et al.*
Case No. 23-11683-H

Munson, Gregory M.

    (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

Okeelanta Corporation

    (Plaintiff-Appellant)

Perko, Gary V.

    (Counsel for Plaintiff-Appellant Sugar Cane Growers Cooperative of

    Florida)

Phillips, Luna E.

    (Counsel for Plaintiff-Appellant U.S. Sugar Corp.)

Pinkham, James A.

    (Defendant-Appellee)

Samson, A. Ansley

    (Counsel for Amici in District Court)

Sanibel-Captiva Conservation Foundation, Inc.

    (Amicus in District Court)

Sanibel-Captiva Islands Chamber of Commerce, Inc.

    (Amicus in District Court)

Scala-Olympio, Laura E.

    (Counsel for Joint Amicus, the Florida Fruit & Vegetable Association

    and Florida Farm Bureau Federation)

*U.S. Sugar Corp., et al. v. U.S. Army Corps of Engineers, et al.*
Case No. 23-11683-H

South Florida Water Management District

    (Amicus in District Court)

Spellmon, Lt. Gen. Scott A.

    (Defendant-Appellee)

Sugar Cane Growers Cooperative of Florida

    (Plaintiff-Appellant)

Sullivan, Sally J.

    (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

Throckmorton, Charles

    (Counsel for Plaintiff-Appellant Okeelanta Corp.)

U.S. Army Corps of Engineers

    (Defendant-Appellee)

U.S. Attorney's Office, Southern District of Florida

    (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

U.S. Department of Justice, Environment and Natural Resource Division

    (Counsel for Defendant-Appellee U.S. Army Corps of Engineers)

U.S. Sugar Corporation

    (Plaintiff-Appellant)

Wormuth, Christine E.

    (Defendant-Appellant)

*U.S. Sugar Corp., et al. v. U.S. Army Corps of Engineers, et al.*
Case No. 23-11683-H

\* \* \*

Plaintiff-Appellant Okeelanta Corporation discloses that New Hope Sugar Co-Op is a parent corporation that owns 10% or more of Okeelanta Corporation's stock.

## STATEMENT ON ORAL ARGUMENT

The district court's opinion below effectively re-writes a compromise struck by Congress in the Water Resources Development Act of 2000 (WRDA 2000) and Congressionally-mandated regulations implementing that act.  The district court opinion alters the law and regulations arising from WRDA 2000 by allowing the U.S. Army Corps of Engineers to base decisions impacting water supply in the Everglades on current availability of water supply resulting from operational rules set in 2008, rather than the statutorily-required 2000 water availability.  Because the district court's decision sweeps aside federal law and federal regulations, this appeal merits the Court's attention at oral argument.

The district court's sweeping decision not only damages the law; it harms farmers and property owners who depended on the water level compromise in WRDA 2000 to run their farms, plant crops, contribute to the nation's food supply, and employ thousands of workers.  The broad impact of the district court's decision, and the precedent set by it, also merits the Court's scrutiny at oral argument.

Finally, the nuances of the issues also make this appeal suitable for oral argument.

## TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ..................................................................C-1

STATEMENT ON ORAL ARGUMENT ................................................... i

TABLE OF CONTENTS......................................................................... ii

TABLE OF CITATIONS ........................................................................ iv

STATEMENT ON ADOPTION OF BRIEFS OF OTHER PARTIES.....................1

STATEMENT ON JURISDICTION.......................................................2

STATEMENT OF THE ISSUES...............................................................3

STATEMENT OF THE CASE..................................................................6

    A.    The Central and Southern Florida Project............................6

    B.    The Comprehensive Everglades Restoration Plan and the
        Savings Clause ...................................................................9

    C.    The EAA Project ..............................................................14

    D.    Agency Analysis Pursuant to the Savings Clause...............17

    E.    Proceedings in District Court ............................................22

SUMMARY OF ARGUMENT ................................................................26

ARGUMENT .......................................................................................29

    A.    Standard of Review ..........................................................29

**TABLE OF CONTENTS**
(continued)

*Page*

B.    The Army Corps Violated the WRDA 2000 Savings Clause and Programmatic Regulations When it Used the Wrong Water Supply Baseline ...................................................................31

1.    The Agency Did Not Use the Pre-CERP Baseline for its Savings Clause Analysis Contrary to the Requirements of WRDA 2000 and the Programmatic Regulations ....................31

2.    The District Court Order Erred in Concluding that the Corps Need Not Use the Pre-CERP Baseline in its Analysis of the EAA Project ....................................................39

C.    The Army Corps Violated NEPA and the Savings Clause By Approving the EAA Project Without Analyzing the Effects on Water Supply of Operating the Stormwater Treatment Area for Years Before Completion of the Reservoir ........................................45

1.    The Agency Failed to Analyze the Water Supply Effects of Operating the Stormwater Treatment Area Before Completion of the Reservoir ....................................................45

2.    The District Court Order Erred in Concluding that a Promise During Oral Argument to Conduct Future Analysis Cured the NEPA Violation ........................................52

CONCLUSION ................................................................................55

CERTIFICATE OF COMPLIANCE ...........................................................57

CERTIFICATE OF SERVICE ...............................................................58

iii

<u>**TABLE OF CITATIONS**</u>

<u>**Cases**</u>                                                                                 <u>*Page*</u>

*Center for Biological Diversity v. U.S. Army Corps of Engineers*,
    941 F.3d 1288 (11th Cir. 2019) ...................................................46

\* *Charter Federal Savings & Loan Ass'n, West Point, Georgia v. Office
    of Thrift Supervision*,
    912 F.2d 1569 (11th Cir. 1990) .........................................................35

\* *Chewy, Inc. v. U.S. Department of Labor*,
    69 F.4th 773 (11th Cir. 2023) ............................................................35

*Christensen v. Harris County*,
    529 U.S. 576 (2000)..............................................................................36

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979)..............................................................................33

*City of Oxford, Georgia v. Federal Aviation Administration*,
    428 F.3d 1346 (11th Cir. 2005) .......................................................54

*Conservancy of Southwest Florida v. U.S. Fish & Wildlife Service*,
    677 F.3d 1073 (11th Cir. 2012) .......................................................30

*Corley v. United States*,
    556 U.S. 303 (2009)..............................................................................45

*Defenders of Wildlife v. Bureau of Ocean Energy Management*,
    684 F.3d 1242 (11th Cir. 2012) .......................................................30

*Defenders of Wildlife v. United States Department of the Navy*,
    733 F.3d 1106 (11th Cir. 2013) .......................................................46

\* *Delaware Riverkeeper Network v. Federal Energy Regulatory
    Commission*,
    753 F.3d 1304 (D.C. Cir. 2014).........................................................52

## TABLE OF CITATIONS
(continued)

*Page*

*Dubin v. United States*,
 143 S. Ct. 1557 (2023)......................................................................42

*Encino Motorcars LLC v. Navarro*,
 579 U.S. 211 (2016)........................................................................33

*Federal Communications Commission v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009)....................................................................34, 35

*Groff v. DeJoy*,
 143 S. Ct. 2279 (2023)....................................................................43

*Islam v. Secretary, Department of Homeland Security*,
 997 F.3d 1333 (11th Cir. 2021) ....................................................29

\* *Kisor v. Wilke*,
 139 S. Ct. 2400 (2019).....................................................................36

*Kleppe v. Sierra Club*,
 427 U.S. 390 (1976)...................................................................52, 54

*Marsh v. Oregon Natural Resources Council*,
 490 U.S. 360 (1989)........................................................................46

*Miccosukee Tribe of Indians of Florida v. United States*,
 716 F.3d 535 (11th Cir. 2013) ........................................................9

*Motor Vehicles Manufacturers Ass'n of the United States, Inc. v. State
 Farm Mutual Automobile Insurance Co.*,
 463 U.S. 29 (1983).........................................................................30

*National Ass'n of Manufacturers v. Department of Defense*,
 138 S. Ct. 617 (2018).....................................................................43

## TABLE OF CITATIONS
(continued)

*Page*

*Natural Resources Defense Council, Inc. v. United States Army Corps of Engineers*,
    2001 WL 1491580 (S.D. Fla. June 28, 2001)...............................................18

\* *New Hope Power Co. v. United States Army Corps of Engineers*,
    746 F. Supp. 2d 1272 (S.D. Fla. 2010)...............................................36

*Ohio Valley Environmental Coalition v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009)...............................................46

*Perez v. Mortgage Bankers Ass'n*,
    575 U.S. 92 (2015)...............................................33, 35

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)...............................................46, 49

*Salmeron-Salmeron v. Spivey*,
    926 F.3d 1283 (11th Cir. 2019)...............................................29

*SAS Institute Inc. v. Iancu*,
    138 S. Ct. 1348 (2018)...............................................30

*Sierra Club v. Martin*,
    168 F.3d 1 (11th Cir. 1999)...............................................30

*Sierra Club v. Martin*,
    510 F.2d 813 (5th Cir. 1975)...............................................48

\* *Simmons v. Block*,
    782 F.2d 1545 (11th Cir. 1986)...............................................30, 35, 44

*United States v. Mead Corp.*,
    533 U.S. 218 (2001)...............................................33

*United States v. Nixon*,
    418 U.S. 683 (1974)...............................................34

vi

## TABLE OF CITATIONS
(continued)

*Page*

*Ysleta Del Sur Pueblo v. Texas*,
142 S. Ct. 1929 (2022) ................................................................. 45

**Constitutional Provisions**

U.S. CONST., art. III, § 2 .............................................................. 2

**Statutes**

5 U.S.C. § 551 .............................................................................. 41

5 U.S.C. § 702 .............................................................................. 2

5 U.S.C. § 706 .............................................................................. 30

28 U.S.C. § 1291 .......................................................................... 2

28 U.S.C. § 1331 .......................................................................... 2

28 U.S.C. § 2201 .......................................................................... 2

42 U.S.C. § 4332 .......................................................................... 46

America's Water Infrastructure Act of 2018, Pub. L. No. 115-270,
§ 1308(a), 132 Stat. 3765 (Oct. 23, 2018) ................................. 15

Flood Control Act of 1948, Pub. L. No. 858, § 203, 62 Stat. 1176
(June 30, 1948) ........................................................................... 7

Flood Control Act of 1954, Pub. L. No. 780, § 203, 68 Stat. 1257
(Sept. 3, 1954) ............................................................................ 7

Water Infrastructure Improvements for the Nation Act of 2016, Pub.
L. No. 114-322, 130 Stat. 1714 (Dec. 16, 2016) ........................ 15

## TABLE OF CITATIONS
(continued)

*Page*

Water Resources Development Act of 1992, Pub. L. No. 102-580,
§ 309(l), 106 Stat. 4844 (Oct. 31, 1992)........................................................10

Water Resources Development Act of 1996, Pub. L. No. 104-303,
§ 528(b)(1)(A)(i), 110 Stat. 3767 (Oct. 12, 1996)........................................10

Water Resources Development Act of 2000, Pub. L. No. 106-541,
§ 601, 114 Stat. 2572 (Dec. 11, 2000)....................................................*passim*

Water Resources Development Act of 2020, Pub. L. No. 116-260, 134
Stat. 1182 (Dec. 27, 2020)...........................................................................15

## **Rules**

Federal Rule of Appellate Procedure 4.....................................................................2

## **Regulations**

33 C.F.R. § 385 .........................................................................................................4

33 C.F.R. § 385.1 ...........................................................................................12, 31

33 C.F.R. § 385.3 ................................................................................................*passim*

33 C.F.R. § 385.5 ....................................................................................14, 34, 35

33 C.F.R. § 385.26 ...............................................................................................*passim*

33 C.F.R. § 385.35 ...............................................................................................13

33 C.F.R. § 385.36 ...............................................................................................*passim*

40 C.F.R. § 1501.9 ...........................................................................................46, 51

40 C.F.R. § 1502.4 ...............................................................................................51

## TABLE OF CITATIONS
(continued)

*Page*

40 C.F.R. § 1505.2 ...........................................................................46

40 C.F.R. § 1506.1 ...........................................................................47

40 C.F.R. § 1506.10 .........................................................................49

68 Fed. Reg. 64200, 2003 WL 22656866 (Nov. 12, 2003) .............................*passim*

## Other Authorities

146 Cong. Rec. H11816-03, 2000 WL 1651211 (daily ed. Nov. 3, 2000) .........................................................................................3

Black's Law Dict. (11th ed. 2019) ...........................................................33

Senate Report No. 106-362 ...............................................................12, 37

Webster's Ninth New Collegiate Dictionary (9th ed. 1989) .............................36, 37

## STATEMENT ON ADOPTION OF BRIEFS OF OTHER PARTIES

In addition to the arguments made in this brief, Appellant Okeelanta Corporation adopts the arguments set forth in the brief of Appellant Sugar Cane Growers Cooperative of Florida, and Appellant U.S. Sugar Corporation regarding the interpretation of the WRDA 2000, Section 601(h)(5) (the Savings Clause), and the application of the National Environmental Policy Act, to the extent that they are not in conflict with any argument made in this brief.

## STATEMENT ON JURISDICTION

The district court exercised federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2201, 5 U.S.C. §§ 701-06, and U.S. CONST., art. III, § 2.  Appellant Okeelanta Corporation brought this claim under the Administrative Procedure Act, which provides a right to judicial review to any person adversely affected by an agency action.  5 U.S.C. § 702.

The district court entered judgment on March 22, 2023, *see* (Doc. 77, J.A. 1425), and Okeelanta Corporation timely noticed this appeal against an agency of the United States on May 17, 2023, within 60 days of the district court's judgment. *See* (Doc. 79); Fed. R. App. P. 4(1)(B)(ii).

Pursuant to 28 U.S.C. § 1291, this Court has jurisdiction to decide this appeal from a final decision of the U.S. District Court of the Southern District of Florida.

## STATEMENT OF THE ISSUES

In a notable act of bipartisanship, Congress in 2000 passed the Water Resources Development Act that authorized projects to restore the Florida Everglades and increase water supply for farmers and the growing communities of South Florida. The legislation won "the support of every major stakeholder involved in the Everglades," even though in the past many of those competing interests "would often not even speak to each other[.]" *See* 146 Cong. Rec. H11816-03, H11817, 2000 WL 1651211 (daily ed. Nov. 3, 2000) (statement of Rep. Goss). Congress overcame this "immense challenge" and brought all the stakeholders together because the law included a critical compromise. The Savings Clause in the legislation promised that the federal government would not reduce water supply for existing users that was available at the time, but instead address environmental challenges while enlarging the water supply for all stakeholders. The Savings Clause guaranteed that the government "shall not eliminate or transfer existing legal sources of water," including for agriculture or the urban water supply, until it first makes available "a new source of water supply of comparable quantity and quality" to that which was available when the law passed in 2000. WRDA 2020, Pub. L. No. 106-541, § 601(h)(5), 114 Stat 2572 (Dec. 11, 2000).

After forging this compromise, Congress directed the U.S. Army Corps of Engineers to cement the guarantee in federal regulations. The Corps did so by

enacting Programmatic Regulations through the notice-and-comment process. *See* 33 C.F.R. Part 385.

Twenty years later, the Corps has approved a massive civil works project, the EAA Project, without ensuring that at least the same amount of water will be available as was available in 2000 for the Everglades' many agricultural users, including Appellant Okeelanta Corp. The Corps approved the project without complying with WRDA 2000 or conducting the water supply analysis that its own regulations require to ensure compliance with the Saving Clause. Instead, the Corps moved the goal post, relying on an unapproved draft guidance memorandum to base its water analysis on lesser amounts of water made available by operational changes to the regional water project in 2008, rather than 2000 baseline conditions fixed by the Savings Clause. These changes threaten the supply of water that farmers like Okeelanta use to irrigate their crops, and upset the careful compromise Congress struck to balance the interest of farmers, developers, and environmentalists.

This case presents a challenge to the Corps' decision and presents two principal questions on appeal:

1.    Did the U.S. Army Corps of Engineers comply with WRDA 2000 and Programmatic Regulations when it compared the water supply for the EAA Project to current levels of water supply, despite the regulations requiring a comparison to the 2000 pre-CERP baseline?

4

2.    Did the U.S. Army Corps of Engineers comply with NEPA and the WRDA 2000 Savings Clause when it approved the EAA Project without evaluating the water supply effects of operating the Stormwater Treatment Area component of the project for several years prior to completion of the reservoir component?

## STATEMENT OF THE CASE

### A.    The Central and Southern Florida Project

This case concerns the U.S. Army Corps of Engineers' ("Corps") 2020 approval of the Everglades Agricultural Area Project ("EAA Project"), which will be a component of the Central and Southern Florida Project for Flood Control and Other Purposes ("Central and Southern Florida Project").

The Central and Southern Florida Project is a regional civil works project built and operated by the Corps and its local sponsor, the South Florida Water Management District ("SFWMD"). It consists of about 1000 miles each of levees and canals, 150 water control structures, 16 major pump stations and other features that the agencies use to manage surface waters in South Florida. *See* J.A. 990.[1]

Lake Okeechobee sits at the center of the project, which stretches from Orlando to the Florida Keys, as shown in this map:

---

[1] The record below is cited as "Doc. [number] at [page number]," referring to the docket entry number in the district court and the CM/ECF page number.

The parties lodged the administrative record with the Clerk of the U.S. District Court by conventional, rather than electronic, filing because of the record's size. *See* (Doc. 39, J.A. 188, 41-42, J.A.192, 43-44, J.A. 738, 986, 49, J.A. 1159). Citations to the administrative record use the page numbering system provided by the Corps.

All internal citations and quotations are omitted, and all emphasis is added, unless otherwise indicated.



J.A. 999.

Congress originally authorized the Central and Southern Florida Project in the

Flood Control Acts of 1948 and 1954. Pub. L. No. 858, § 203, 62 Stat. 1176 (June

30, 1948); Pub. L. No. 780, § 203, 68 Stat. 1257 (Sept. 3, 1954); J.A. 1239.  Those

laws approved a comprehensive plan developed by the Corps that expanded existing

water control facilities into a regional system for water management. *Id.* The primary project purposes for the Central and Southern Florida Project as established in the Flood Control Act of 1948 and subsequent Congressional authorizations over the next half century were flood protection, agricultural and urban water supply, navigation, limiting saltwater intrusion into coastal wellfields, J.A. 1000-1003;, J.A. 1240.

The hydrological center of the Central and Southern Florida Project is Lake Okeechobee. JA. 1247. The lake is surrounded by the Herbert Hoover Dike and can hold more than five million acre feet of water. J.A. 1239, 1241.[2] The agencies use the lake to store water to provide flood protection in the wet season and in years with high rainfall, and to provide water supply in the dry season and in drought years. J.A. 1104. Water in Lake Okeechobee can be sent south to the Everglades, east and west to the St. Lucie and Caloosahatchee Rivers, and to agricultural and urban users around the lake and along the southeast coast of Florida. J.A. 1243; J.A.1110; When water levels in the lake are high (such as at the end of the rainy season or in a wet year), the agencies release large volumes primarily to the St. Lucie and Caloosahatchee Rivers. J.A.1107-1109; J.A. 1119. When water levels are low (such

---

[2] An acre-foot is a standard measure of water volume, and represents the amount of water that would cover an acre of land one foot deep, which is 43,560 cubic feet. J.A. 1029.

as in the dry season or in a drought year), the agencies release water to agricultural and urban water users. J.A. 1006; J.A. 1010-1011; J.A. 976; Doc. 28-1, ¶¶ 12-21, J.A. 114-118. Lake Okeechobee is essentially the only supplemental source of water to meet irrigation demands in the Everglades Agricultural Area south of the lake. J.A. 1009; J.A. 1110-1112. When there is insufficient water in the lake, farmers such as appellant Okeelanta Corporation ("Okeelanta") are forced to cut back on their water use, which harms their crops, property, and businesses. J.A. 995; J.A. 1005; J.A. 996; J.A.1118; Doc. 28-1 ¶¶ 15-23, J.A. 116-118.

The Corps controls how much water is stored and released from the lake and other Central and Southern Florida Project features using water regulation schedules. *See Miccosukee Tribe of Indians of Fla. v. United States,* 716 F.3d 535, 541-42 (11th Cir. 2013); J.A. 1004; J.A. 1243. A regulation schedule is an operating manual that guides agency decisions regarding the inflow and outflow of water through water control structures under different water conditions. J.A. 1110-1115. It is the primary tool used by water managers to regulate water levels in Lake Okeechobee, which determines the amount of water supply available in the lake for users. J.A. 1115; J.A. 1241.

B.    **The Comprehensive Everglades Restoration Plan and the Savings Clause**

For its first half century, the Central and Southern Florida Project for the most part achieved the original project purposes of flood protection and water supply,

9

which allowed millions of people to move to South Florida. J.A. 997. However, the project had unintended adverse effects on the South Florida ecosystem, which led to a decline in ecological conditions. J.A. 994; J.A. 997-998. In the 1990s, Congress directed the Corps to develop a new comprehensive plan that would restore, preserve and protect the South Florida ecosystem while providing flood control and the enhancement of water supplies. Water Resources Development Act of 1992, Pub. L. No. 102-580, § 309(l), 106 Stat. 4844 (Oct. 31, 1992); Water Resources Development Act of 1996, Pub. L. No. 104-303, § 528(b)(1)(A)(i), 110 Stat. 3767 (Oct. 12, 1996).

In response, the Corps developed the Comprehensive Everglades Restoration Plan ("CERP" or the "Plan") to serve as a new comprehensive plan for the Central and Southern Florida Project. One of the central strategies of CERP was to grow the water pie, and "vastly increase water storage and water supply for the natural system as for urban and agricultural needs." J.A. 993; J.A. 996; J.A. 1007-1008; J.A. 1012; Programmatic Regulations for CERP, Final Rule, 68 Fed. Reg. 64200, 2003 WL 22656866 (Nov. 12, 2003) (similar language about a vast increase in storage). The Corps proposed to do this by changing the operation of existing features of the Central and Southern Florida Project, and sought authorization to build a number of additional project features, including the EAA Project at issue in this case. J.A. 1013; J.A. 1014.

10

Congress approved the CERP and authorized the Corps to implement it in the Water Resources Development Act of 2000 ("WRDA 2000"). Pub. L. No. 106-541, § 601, 114 Stat. 2572 (Dec. 11, 2000). WRDA 2000 provides that "the Plan is approved as a framework for modifications and operational changes to the Central and Southern Florida Project that are needed to restore, preserve and protect the South Florida ecosystem while providing for the other water-related needs of the region, including water supply and flood protection." *Id.* § 601(b)(1)(A). Congress directed the Corps to "integrate the activities [in the Plan] with ongoing Federal and State projects and activities." *Id.* § 601(b)(1)(B).

WRDA 2000 includes protections for existing users of the Central and Southern Florida Project. In the plan development process, stakeholders recommended that there needed to be protections for existing project users during implementation of CERP so that the Corps would not seek to achieve environmental objectives by re-dividing the existing water pie. J.A. 1023-1025. WRDA 2000 therefore includes a Savings Clause:

> Until a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act [December 11, 2000] is available to replace the water to be lost as a result of implementation of the Plan, the Secretary [of the Army] and the non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for -- (i) an agricultural or urban water supply....

WRDA 2000, § 601(h)(5).

11

The Corps has stated that the intent of this prohibition is that "[e]limination of existing sources of water supply is barred until new sources of comparable quantity and quality of water are available." Programmatic Regulations Final Rule, 68 Fed. Reg. at 64216 (quoting Senate Report No. 106-362).

Congress required the Corps to "promulgate Programmatic Regulations to ensure that the goals and purposes of the Plan are achieved." WRDA 2000, § 601(h)(3)(A). The Corps issued the regulations in 2003 to "establish the process necessary for implementing the Plan." Programmatic Regulations Final Rule, 68 Fed. Reg. at 64221 (promulgating 33 C.F.R. § 385.1(b)). The regulations provide that for each project identified in the Plan, the Corps must prepare a Project Implementation Report which provides the information "necessary for the Secretary of the Army to approve the project for implementation." 33 C.F.R. § 385.26(a)(1). The Project Implementation Report must determine compliance with the Savings Clause, *id.* § 385.26(a)(3)(x), and include the appropriate environmental analysis under NEPA, *id.* § 385.26(d). The Corps cannot request authorization for a project, and the Assistant Secretary of the Army cannot approve a project, until the Project Implementation Report is complete. *Id.* §§ 385.26(a)(1), (f)(7).

The Programmatic Regulations also establish other procedures to effectuate the provisions of WRDA 2000. Relevant to the Savings Clause, the regulations provide that a Project Implementation Report must "include analyses to determine

12

if existing legal sources of water are to be eliminated or transferred as a result of project implementation." 33 C.F.R. § 385.36(a). The regulations establish a specific method for making that determination when the Corps proposes a particular CERP project:

> The Corps of Engineers and the non-Federal sponsor shall determine if implementation of the project will cause an elimination or transfer of existing legal sources of water by comparing the availability of water with the recommended project with the pre-CERP baseline developed in accordance with § 385.35(a)….

*Id.*; *see also* § 385.26(a)(3)(x). The "pre-CERP baseline" is defined in the regulations as "the hydrologic conditions in the South Florida ecosystem on the date of enactment of WRDA 2000 [December 11, 2000], as modeled using a multi-year period of record based on assumptions such as … assumed operations of the Central and Southern Florida Project." 33 C.F.R. § 385.3. The Corps was required to issue an approved document by June 2004 that set forth the assumptions to be contained in the pre-CERP baseline, *id.* § 385.35(a)(1), but never did so, Doc. 45 ¶ 43 (Federal Defendants' answer, admitting allegation that "the Corps and SFWMD never issued a final, approved pre-CERP baseline").

The Programmatic Regulations also provide that the Corps must develop "a guidance memorandum" that "describe[s] the process for comparing the recommended project with the pre-CERP baseline." 33 C.F.R. § 385.36(b). The regulations provide that the Corps must develop the guidance memorandum by

December 2004, and establish "[s]pecial processes" for its development culminating with "approval by the Secretary of the Army" so that there would be consensus among stakeholders. *Id.* § 385.5(b). The Corps never issued an approved guidance memorandum as required by the regulations, but issued a draft in 2007. J.A. 751-769; J.A. 936-937. The draft memorandum asserts that there are some Corps modifications to the Central and Southern Florida Project that are not subject to WRDA 2000 (so-called "intervening non-CERP activities") and that the Corps can ignore their effects in subsequent Savings Clause analyses. J.A. 758.

### C.    The EAA Project

The EAA Project is one of the projects identified in CERP. J.A. 857. The project calls for construction of a reservoir in the Everglades Agricultural Area between Lake Okeechobee and the Everglades, which can be used to store water from the lake for release to the Everglades or agricultural users. J.A. 565; J.A. 662; J.A. 624; J.A. 853; J.A. 860. The project also includes a stormwater treatment area ("STA") to remove phosphorus from water delivered to the Everglades to address water quality concerns. J.A. 438. The stormwater treatment area filters the phosphorous by flowing water through an engineered wetland before discharge downstream. *Id.*

The project has evolved over time through several Corps planning processes. Congress originally authorized construction of an EAA reservoir in WRDA 2000.

WRDA 2000, § 601(b)(2)(c)(ii).  The Corps started planning for the project in 2005 but stopped work in 2008.  *See NRDC v. Van Antwerp,* Case No. 9:07-cv-80444, at ECF No. 193 (S.D. Fla. 2009).  The Corps then re-started planning for the project in 2011 as part of a suite of CERP projects known as the Central Everglades Planning Project.  J.A. 794-795.  As part of the Central Everglades Planning Project, the project analyzed stored water in a shallow flow-equalization basin and had no stormwater treatment area.  J.A.1055; J.A. 1056; J.A. 1052.  The Corps issued a Project Implementation Report for this version of the project in 2014 and approved it with a Record of Decision in 2015.  J.A. 1100-1102; J.A. 1051.  Congress authorized the Central Everglades Planning Project in 2016.  WRDA 2016, Public Law No. 114-322, § 1401(4), 130 Stat. 1714 (Dec. 16, 2016).

In 2018, the State of Florida proposed to increase the storage capacity of the reservoir and add a stormwater treatment area.  The SFWMD prepared a Post-Authorization Change Report (also known as a Section 203 report) that included a draft Environmental Impact Statement.  J.A. 559-560; J.A. 849-851 (describing SFWMD 240,000 acre-foot reservoir).  Congress authorized the revised EAA Project as a Post-Authorization Change to the original design, subject to Corps modification, Pub. L. No. 115-270, § 1308(a), 132 Stat. 3765, 3819 (Oct. 23, 2018), and subsequently authorized the project as revised by the Corps.  WRDA 2020, § 324, Pub. L. No. 116-260, 134 Stat. 1182 (Dec. 27, 2020).

This map shows the location of the reservoir and stormwater treatment area:



J.A. 495.

In 2020, the Corps issued a draft final Environmental Impact Statement in January 2020 and a final Environmental Impact Statement ("FEIS") in May 2020. J.A. 829; J.A. 848.

The Assistant Secretary of the Army issued a Record of Decision approving the EAA Project as a civil works project in May 2020. J.A. 842. The Corps issued a Record of Decision in April 2020 that approved a Clean Water Act Section 404 permit to the SFWMD, authorizing the discharge of dredged and fill material into the waters of the United States in connection with construction of the project. J.A. 465; J.A. 471. In April 2021, the Corps and SFWMD entered into a Project

Partnership Agreement based on the 2020 FEIS that governs the two agencies' responsibilities for building and operating the EAA Project.  J.A. 712.

The reservoir and stormwater treatment area components of the EAA Project are being implemented on different schedules.  Construction of the reservoir is not scheduled to be completed until at least 2029. J.A. 708.  Construction of the stormwater treatment area is scheduled to be completed this year, i.e., 2023.  J.A. 828.  After the STA is built, there is a vegetation grow-in phase scheduled to finish in 2025, after which the STA can be used for flow-through operations and be ready to deliver treated water to the Everglades.  J.A. 434-435 (2020 ROD, stating that the grow-in period "is expected to last approximately 2 years").   The stormwater treatment area component therefore will be ready for operations at least four years before completion of the reservoir component.

### D.    Agency Analysis Pursuant to the Savings Clause

For years in the administrative process, Okeelanta and its affiliates asked the Corps to ensure that the EAA Project would protect the water supply available when WRDA 2000 was enacted.  J.A. 1098-1099; J.A. 980;  J.A. 1096-1097.  Okeelanta also asked the Corps to analyze the water supply effects of operating the STA before the reservoir is completed.  J.A. 498.

The Corps prepared an analysis under the WRDA 2000 Savings Clause for the EAA Project.  In 2014, the Corps included a Savings Clause analysis in the

Project Implementation Report for the then-current version of the project. J.A. 1120-1137. In 2018, the SFWMD included a Savings Clause analysis for the revised project (which included a larger reservoir with an STA) in its Post-Authorization Change Report. J.A. 808; J.A. 814-818. In 2020, the Corps adopted the SFWMD's 2018 Savings Clause analysis. J.A. 354; J.A. 355-430; J.A. 932-936.

The agencies evaluated the water supply performance of the EAA Project using computerized hydrological models that simulate water conditions. J.A. 1129; J.A. 809-810. Such models allow the agencies to input assumptions regarding the structural capacity of Central and Southern Florida Project features and the operational rules (e.g., regulation schedules) under which the features are used. J.A. 1116. The models then analyze how much water would have been available under those assumptions in each year of a multi-decade period of record for which the agencies have rainfall and other climatic data. J.A. 1117; J.A. 810. This allows the agencies to see how much water supply would be available in typical rainfall years, wet years, and drought years. *See generally* J.A. 1116 (LORS description of SFWMD); J.A. 823 (example of modeled analysis showing different results in certain drought years); *see also Natural Resources Defense Council, Inc. v. U.S. Army Corps of Eng'rs,* 2001 WL 1491580, *8 (S.D. Fla. June 28, 2001) (describing example of how hydrological models are used to compare different operational rules).

The agencies never compared the water supply available with the EAA Project to water supply available under the pre-CERP baseline, i.e., using "assumed operations of the Central and Southern Florida Project" on "the date of enactment of WRDA 2000." 33 C.F.R. § 385.3 (definition of "pre-CERP baseline"). J.A. 799 ("The original Pre-CERP Baseline … [was] not used for CEPP analyses (RSM model representations were not developed)"); J.A. 813-815 ("The original Pre-CERP Baseline … [was] not used for the CEPP PACR analysis"). This reflects the fact that the Corps never issued an approved pre-CERP baseline as required by the Programmatic Regulations. Doc. 45 ¶ 43, J.A. 1150. Instead, the agencies compared water supply with the EAA Project with levels of water supply provided by existing Central and Southern Florida Project operational rules in effect at the time the analyses were conducted in 2014-2020. J.A. 1057; J.A. 637; J.A. 797-799.

Current operational rules for the Central and Southern Florida Project provide less water supply than was available in 2000 when CERP was approved. The Corps has diminished the available water supply by changing how it manages water in Lake Okeechobee, the primary feature of the Central and Southern Florida Project where water is stored for agricultural and urban users. J.A. 1009. When WRDA 2000 was enacted, the Corps managed Lake Okeechobee water levels using a regulation schedule known as Water Supply and Environment ("WSE"). J.A. 1206. In 2008, the Corps adopted a new water regulation schedule known as the Lake Okeechobee

19

Regulation Schedule ("LORS"). J.A. 1229. LORS lowered average lake stages by approximately 1.0-1.5 feet, which reduced the amount of water stored and available for water users by approximately 500,000 acre feet. J.A. 638; J.A. 956; J.A. 1240 (Lake Okeechobee covers 724 square miles, which is approximately 463,000 acres); J.A. 1247 (LORS lowered average lake levels by 1.0-1.5 feet); *compare* J.A. 1180 (providing for WSE elevation of 18.53 feet) *with* J.A. 1169 (providing that all regulation schedule alternatives for LORS would have a maximum elevation of 17.25 feet). The Corps adopted LORS as a temporary measure to lower lake levels while it made repairs to the Herbert Hoover Dike and to achieve environmental objectives, and said it would be in effect for three years. J.A. 1203; J.A. 1169; J.A. 824. LORS remains in effect today, fifteen years later, although it is scheduled to be replaced with a new regulation schedule later in 2023. Doc. 76, at 9, J.A. 1394; (Doc. 82 at 94:8-10) (Summ. J. Hr'g Tr.). The Corps' Savings Clause analysis for the EAA Project compared water supply with the project to water supply assuming that LORS was in effect in 2008. J.A. 653 (PACR, Annex B Savings Clause analysis); J.A. 637 (Table B-2); J.A. 653 (PACR, Appx A, Annex A-2 Model Documentation Reports); J.A. 797.

The Corps prepared several NEPA documents related to the EAA Project, including the Project Implementation Report for the Central Everglades Planning Project (which functioned as an Environmental Impact Statement) and the May 2020

Final Environmental Impact Statement.  The NEPA documents analyze the effects of construction and operation of the EAA Project.  J.A. 870-931 (2020 FEIS).  In none of these documents did the Corps evaluate an alternative that would provide the same agricultural and urban water supply available when WRDA 2000 was enacted.  J.A. 1054; J.A. 609; J.A. 1059; J.A. 636; J.A. 637; J.A. 653; J.A. 797.  The NEPA documents also do not show how much water supply would be available with the EAA Project compared to what was available in 2000 when Congress approved the CERP.  J.A. 609; J.A. 866.  The NEPA documents state that the EAA Project increases water storage compared to current levels, *see, e.g.,* J.A. 903 (2020 FEIS), but does not acknowledge that the Corps is still providing less overall water supply than was available in 2000.  *Compare* J.A. 1240 (Lake Okeechobee covers 724 square miles, which equates to approximately 463,000 acres), and J.A. 1247 (LORS lowered average lake levels by 1.0-1.5 feet) *with* J.A. 842 (EAA Project reservoir has 240,000 acre feet storage capacity).

In the Savings Clause analyses and NEPA documents, the agencies also assumed that the stormwater treatment area and reservoir would only be operated together, and failed to analyze how flow-through operations of the stormwater treatment area prior to completion of the reservoir would affect water supply.  J.A. 616-619 (all alternatives combine STA and reservoir).

21

### E.    Proceedings in District Court

Okeelanta filed its complaint in U.S. District Court in West Palm Beach on August 26, 2021 to protect the water supply it needs in dry periods.  Okeelanta is a company that farms land in the Everglades Agricultural Area south of Lake Okeechobee, including land proximate to the location of the EAA Project.  J.A. 946, J.A. 947-948, J.A. 949, J.A. 950, J.A. 975.  Like other farmers in the area, it relies on water provided by the Central and Southern Florida Project to irrigate, its crops, especially during the dry season and drought years.  Doc. 28-1 at 3-5 J.A. 116-118 (Decl. of Thomas K. MacVicar). When water is not available in the Central and Southern Florida Project, such as when water levels in Lake Okeechobee are low, Okeelanta and neighboring farmers receive less water to irrigate their crops. *Id.*

Okeelanta's amended complaint brings two claims pursuant to the Administrative Procedure Act.  The first claim is that the Corps violated the WRDA 2000 Savings Clause and the Programmatic Regulations when it approved the EAA Project without comparing the water supply with the EAA Project to the water supply available under the 2000 pre-CERP baseline, and when it failed to analyze the water supply effects of standalone operations of the stormwater treatment area. Doc. 31 at 16, J.A. 152. The second claim is that the Corps violated the National Environmental Policy Act when it failed to analyze the water supply effects of

operating the stormwater treatment area before completion of the reservoir.  Doc. 31 at 16-18, J.A. 152-154.

The district court consolidated Okeelanta's case with the separate cases filed by U.S. Sugar Corporation and the Sugar Cane Growers Cooperative.  Doc. 20.

The Corps filed a Motion to Dismiss that challenged the plaintiffs' standing. Doc. 25.   The district court denied the motion, finding that Okeelanta and the other plaintiffs had alleged sufficient facts to demonstrate that they have a concrete and particularized interest, i.e., that they use water from Lake Okeechobee to irrigate their crops during droughts and dry periods, Doc. 37 at 6, 10-11, J.A. 168, 172-173; that they will be harmed as a result of the agency's actions because "the frequency and severity of water shortages will materially increase" as a result of the challenged actions; *e.g., id.* at 20, 24, J.A. 182, 186; and that plaintiffs' procedural claims mean proof of redressability is relaxed, *id.* at 9, J.A. 171.

The parties filed cross Motions for Summary Judgment based on the administrative record provided by the Corps.  Doc. 50, J.A. 1259; Doc. 56.

On March 21, 2023, the district court entered an order granting the Corps' Motion for Summary Judgment and denying the Plaintiffs' Motion for Summary Judgment.  Doc. 76, J.A. 1386.  On the Savings Clause claim, the Order concluded that if water supply was reduced as the result of a previous agency action that was not part of CERP (which it referred to as an "intervening non-CERP activity"), then

the Corps did not need to compare water supply with the EAA Project to water supply available under the pre-CERP baseline.  It reached this conclusion based on the logic of a Corps' guidance memorandum that was issued in draft in 2007 but never finalized.  The guidance memorandum focused on the phrase in the Savings Clause "as a result of implementation of the Plan."  Most of the Order consisted of a discussion of whether the Corps had to comply with the Savings Clause when it adopted LORS in 2008, Doc. 76 at 19-34, J.A. 1404-1419, which it saw as answering the question of whether LORS was an "intervening non-CERP activity," and concluded that LORS "changed the baseline" for the Savings Clause, *id.*, at 3, 15, J.A. 1358, 1400.  The Order criticized plaintiffs for not filing a lawsuit when the Corps adopted LORS in 2008, *id.* at 20-21, J.A. 1405-1406, and offered advice to the Corps on proposed future changes to regulation schedules for Lake Okeechobee, *id.* at 15, J.A. 1400.

The Order stated that it was giving no deference to the Corps' interpretation of the Savings Clause, Doc. 76 at 16, J.A. 1401, but it effectively adopted the Corps' position on the water supply baseline set forth in the 2007 draft guidance memorandum, and also excused multiple agency violations of the Programmatic Regulations as, for instance, "due to the nature of the bureaucratic process."  (Doc. 76 at 7, J.A. 1392) (accepting the Corps' explanation that bureaucracy caused its failure to finalize guidance memorandum as required in 2005 ), (Doc. 75 at 35 n.24

(stating that "I do not find that significant" that the Corps missed the deadline to issue a final pre-CERP baseline).  The district court also apparently misunderstood the fact that the pre-CERP baseline does not represent a fixed quantity of water but rather is the amount of water that would be available under different rainfall conditions if the facilities and operational rules in existence in 2000 remained in effect.  *Compare* Doc. 76 at 6, J.A. 1391 ("[t]he level/quality of water available 'as that available on the date of enactment of this Act' is referred to as the 'pre-CERP baseline'"), 17-18, J.A. 1402-1403 ("what else would Plaintiffs have the Corps call a drought [other than an intervening non-CERP activity]?") *with* 33 C.F.R. § 385.3 (definition of pre-CERP baseline as modeled conditions based on assumptions regarding structures and operations in 2000); *see also* Doc. 76, at 2, J.A. 1387("The facts of this case can be difficult to get through.").

On the NEPA claim, the Order acknowledged that the Corps' NEPA analysis completed prior to issuing its record of decision assumed that the STA and reservoir would operate in tandem, and that there was no analysis of standalone operation of the stormwater treatment area after the grow-in period.  Doc. 76, at 36, J.A. 1421.  However, the Order stated that agency counsel had committed the Corps at oral argument to analyze this issue before the STA started operations, *id.* at 37-38, J.A. 1422-1423 and entered summary judgment for the Corps due to "the broad discretion

that agencies are given as to *when* they perform a NEPA analysis." *Id.* at 38, J.A. 1423.

<h2 style="text-align:center"><u>SUMMARY OF ARGUMENT</u></h2>

The Corps approved the EAA Project without ensuring that it would protect agricultural and urban water supply, in violation of WRDA 2000, NEPA, its own regulations, and the Administrative Procedure Act.

The EAA Project is part of the Comprehensive Everglades Restoration Plan, which is a framework for modifications to the Central and Southern Florida Project designed to achieve environmental objectives while protecting existing uses served by the project. A central feature of the CERP is that the Corps would achieve environmental objectives by increasing the amount of water stored in the Central and Southern Florida Project so that more would be available for the natural system (i.e., by growing the water pie), not by redirecting water from existing users (i.e., by dividing the water pie). When Congress approved CERP in WRDA 2000, it included a Savings Clause to ensure that the Corps would not eliminate or transfer existing legal sources of water until comparable alternative sources become available. At Congress' direction, the Corps promulgated Programmatic Regulations that define the process for implementing the Savings Clause. Pursuant to the regulations, the Corps must compare water available with a CERP component (in this case, the EAA Project) with water available when WRDA 2000 was enacted,

the so-called "pre-CERP baseline."  This process ensures that the Corps will achieve environmental goals by growing the water pie, and not by redividing the existing pie of water supply.

The Corps did not follow the process in its own Programmatic Regulations when it approved the EAA Project.  Specifically, the Corps did not compare water supply available with the EAA Project to water supply available under the pre-CERP baseline; in fact, the agency never even finalized a pre-CERP baseline as required in the regulations.  Instead, the Corps compared water availability with the EAA Project to the amount of water supply available at the time the agency conducted its analysis, which is less than the pre-CERP baseline because the Corps reduced the amount of water stored with the Lake Okeechobee Regulation Schedule adopted in 2008.  Use of this alternative procedure violated the Programmatic Regulations and the Savings Clause.  The Corps used this later and lower baseline based upon a draft guidance memorandum that indicated that the Corps could use a different water supply baseline resulting from the agency's actions that it deems to be "intervening non-CERP activities."  Such a guidance memorandum cannot change the requirements of a regulation, and it was arbitrary and capricious for the Corps to follow the procedure in that memorandum instead of following the procedure in the regulations, promulgated through a notice and comment process.

The Corps also violated NEPA and the WRDA 2000 Savings Clause when it approved the EAA Project without evaluating the water supply effects of operating the stormwater treatment area component of the project for several years before completion of the reservoir component. The STA is designed to treat water from Lake Okeechobee before discharging it to the Everglades, and the reservoir component is designed to store lake water so it could be used for environmental or agricultural water supply. The two components could be operated together to protect the water supply, but operating the STA by itself can significantly reduce the amount of water stored in Lake Okeechobee where it is otherwise available to agricultural and urban users. The Corps assumed that the two components would be operated together in its analyses before project approval, despite knowing that the stormwater treatment area will be ready for flow-through operations for several years before completion of the reservoir. The Corps' failure to analyze the effects of standalone STA operations violated NEPA and left the agency blind to potential water supply impacts during that interim period. The Corps also violated WRDA 2000 because it failed to conduct any kind of Savings Clause analysis of standalone STA operations.

The district court erred in entering summary judgment for the Corps. Regarding the proper Savings Clause baseline, the Order misidentified the central issue in the case, by focusing on whether the Corps had to follow the Savings Clause

28

when it adopted LORS in 2008 rather than the baseline the Corps was required to use when it approved the EAA Project in 2020. The Order also made leaps of logic that adoption of LORS somehow changed the requirements of the Programmatic Regulations, ignored the plain language of the regulation governing Savings Clause analyses, and incorrectly presumed that an agency can follow a guidance memorandum in lieu of a regulation.

Regarding standalone operations of the stormwater treatment area, the Order acknowledged that the Corps did not conduct any analysis of water supply effects in that interim period. However, the Order did not even address whether this violated the Savings Clause. With regard to NEPA, the Order wrongly assumed that an agency can defer its analysis to a time after it has approved a project, and that it can deliberately analyze different operational periods of the same project in separate Environmental Impact Statements.

## **ARGUMENT**

### A.    **Standard of Review**

The Court reviews the grant of summary judgment *de novo*, applying the same underlying standard of review used by the district court. *Islam v. Sec'y, Dep't of Homeland Security,* 997 F.3d 1333, 1346 (11th Cir. 2021); *Salmeron-Salmeron v. Spivey,* 926 F.3d 1283, 1286 (11th Cir. 2019).

The Administrative Procedure Act requires the Court to determine whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, … in excess of statutory … limitations…., [or] without observance of procedure required by law…." 5 U.S.C. §§ 706(2)(A), (C), (D); *SAS Institute Inc. v. Iancu,* 138 S. Ct. 1348, 1359 (2018); *Defenders of Wildlife v. Bureau of Ocean Energy Mgmt.,* 684 F.3d 1242, 1248 (11th Cir. 2012). "An agency's failure to follow its own regulations is arbitrary and capricious." *Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.,* 677 F.3d 1073, 1078 n.10 (11th Cir. 2012); *see also Sierra Club v. Martin,* 168 F.3d 1, 4 (11th Cir. 1999) (a court "must overturn agency actions which do not scrupulously follow the regulations and procedures followed by the agency itself") (quoting *Simmons v. Block,* 782 F.2d 1545, 1550 (11th Cir. 1986)). An agency decision is also arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or product of agency expertise." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

**B.    The Army Corps Violated the WRDA 2000 Savings Clause and Programmatic Regulations When it Used the Wrong Water Supply Baseline**

**1.    The Agency Did Not Use the Pre-CERP Baseline for its Savings Clause Analysis Contrary to the Requirements of WRDA 2000 and the Programmatic Regulations**

The Corps violated WRDA 2000 and the Programmatic Regulations implementing the Savings Clause when it approved the EAA Project without comparing water supply available with the EAA Project to water supply available in 2000 when Congress approved the CERP.  The WRDA 2000 Savings Clause states:

> Until a new source of water supply of comparable quantity and quality as that available on the date of enactment of this Act [December 11, 2000] is available to replace the water to be lost as a result of the implementation of the Plan, the Secretary [of the Army] and the non-Federal sponsor shall not eliminate or transfer existing legal sources of water, including those for --- (i) an agricultural or urban water supply…

WRDA 2000, § 601(h)(5).

The Corps promulgated the Programmatic Regulations "to establish the processes necessary for implementing the Plan," 33 C.F.R. § 385.1(b), including section 385.36(a) that establishes the process to implement the Savings Clause.  That section provides:  "[t]he Corps of Engineers and the non-Federal sponsor shall determine if implementation of the project will cause an elimination or transfer of existing legal sources of water *by comparing the availability of water with the recommended project with the pre-CERP baseline* developed in accordance with §

31

385.35(a)….'" 33 C.F.R. § 385.36(a) (emphasis added). The "pre-CERP baseline" is defined as "the hydrologic conditions in the South Florida ecosystem on the date of enactment of WRDA 2000, as modeled by using a multi-year period of record based on assumptions such as land use, population, water demand, water quality, and assumed operations of the Central and Southern Florida Project." *Id.* § 385.3.

The Corps' Savings Clause analysis for the EAA Project did not follow the procedure set forth in section 385.36(a). That section requires the Corps to compare water supply with the EAA Project to water supply available at the pre-CERP baseline using "assumed operations" in effect in 2000. Instead, the Corps compared water supply with the EAA Project to water supply provided by current Central and Southern Florida Project operational rules, i.e., it used current conditions as the baseline. The Central and Southern Florida Project operational rules in effect today provide less water supply than the pre-CERP baseline because the Corps reduced average water levels in Lake Okeechobee in LORS 2008. The Corps could not, consistent with the regulation, assume operations that began in 2008 because the definition of "pre-CERP" baseline specifically states that the Corps must use "assumed operations of the Central and Southern Florida Project" in 2000. *Id.* § 385.3.

The Corps was required to follow the procedures set forth in the Programmatic Regulations. Congress directed the Corps to "promulgate programmatic

32

regulations" after "notice and opportunity for public comment." WRDA 2000, § 601(h)(3)(A). "When Congress authorizes an agency to proceed through notice-and-comment rulemaking, that 'relatively formal administrative procedure' is a 'very good indicator' that Congress intended the regulation to carry the force of law." *Encino Motorcars LLC v. Navarro,* 579 U.S. 211, 220 (2016) (quoting *United States v. Mead Corp.,* 533 U.S. 218, 229-30 (2001)); *see also Perez v. Mortgage Bankers Ass'n,* 575 U.S. 92, 96 (2015)) ("rules issued through the notice-and-comment process … have the 'force and effect of law'") (quoting *Chrysler Corp. v. Brown,* 441 U.S. 281, 302-03 (1979)); Black's Law Dict. (11th ed. 2019) (defining "regulation" as "an official rule or order, having legal force, usually issued by an administrative agency").

The Corps used a different water supply baseline based on a draft guidance memorandum issued in 2007. J.A. 798-799; J.A. 208; J.A. 635; J.A. 751. The guidance memorandum asserts that the Savings Clause does not apply to "intervening non-CERP activities," that LORS was such an activity, and that "intervening non-CERP activities" reset the water supply baseline for Savings Clause analyses conducted for future CERP projects. J.A. 757.

This guidance memorandum cannot be squared with the plain language of 33 C.F.R. 385.36(a). The regulation says nothing about "intervening non-CERP activities." Section 385.36(a) requires a comparison with the "pre-CERP baseline,"

while the guidance memorandum states that intervening non-CERP activities "change the hydrologic conditions from those reflected in the pre-CERP baseline." J.A. 758.    The guidance memorandum makes the reference to the "pre-CERP baseline" a nullity, because the Corps will apparently never use the pre-CERP baseline in conducting future Savings Clause analysis because LORS purportedly reset the baseline.  This is confirmed by the fact that the Corps never finalized a document defining the pre-CERP baseline as required by the Programmatic Regulations, Doc. 45 ¶ 43, J.A. 1150, and did not even include the draft document identifying the pre-CERP baseline in the administrative record.  Notably, the draft guidance does not even discuss section 385.36(a) or attempt to explain how excluding intervening Corps activities can be consistent with a comparison to the pre-CERP baseline.  *See* J.A. 758-759.  The inconsistency with the regulation itself violates the regulation governing development of guidance memoranda.  33 C.F.R. § 385.5(b)(1) ("Guidance memoranda shall be consistent with this part, applicable law, and achieving the goals and purposes of the Plan.").

It was arbitrary and capricious for the Corps to follow the procedure set forth in the guidance memorandum rather than the procedure set forth in its regulation. "An agency may not depart from a prior policy *sub silentio* or simply disregard rules that are still on the books."  *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009) (citing *United States v. Nixon,* 418 U.S. 683, 696 (1974)).  It is arbitrary and

capricious for an agency to follow guidance that is inconsistent with the agency's regulation. *Chewy, Inc. v. U.S. Dep't of Labor,* 69 F.4th 773, 776 (11th Cir. 2023) (holding that agency was "obliged to abide by [] preemption regulation in its decision," and failure to apply that regulation rendered decision arbitrary and capricious); *Simmons v. Block*, 782 F.2d 1545, 1549-50 (11th Cir. 1986) (holding that agency decision was arbitrary and capricious where agency followed policy instead of procedure set forth in regulation); *Charter Fed. Sav. & Loan Ass'n, West Point, Ga. v. Office of Thrift Supervision,* 912 F.2d 1569, 1580-81 (11th Cir. 1990) (holding that agency decision not to follow plain language of regulation, but instead to rely on factors not found in regulation, was arbitrary and capricious).

If the Corps believes that the procedure established in the Programmatic Regulations was incorrect, then the proper course would have been for the agency to amend the regulations. The regulations expressly contemplate that the Corps might revise the regulations to incorporate material from guidance memoranda. 33 C.F.R. § 385.5(b)(6). However, "agencies [must] use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." *Perez,* 575 U.S. at 101 (citing *Fox Television Stations*, 556 U.S. at 515); *see also* Programmatic Regulations Final Rule, 68 Fed. Reg. at 64203 (noting that revisions to regulations require the Corps "to initiate a rulemaking process"). An agency cannot change a rule or create a *de facto* new regulation through issuing a guidance

memorandum. *Kisor v. Wilke,* 139 S. Ct. 2400, 2415 (2019) (citing *Christensen v. Harris Cnty.,* 529 U.S. 576, 588 (2000)); *New Hope Power Co. v. U.S. Army Corps of Eng'rs,* 746 F. Supp. 2d 1272, 1282-84 (S.D. Fla. 2010) (holding that Corps violated APA when it attempted to change regulations through issuance of a memo rather than following notice and comment rulemaking procedures). The Corps' failure to amend its regulations means that it had to follow the existing procedure.

The guidance memorandum itself is highly irregular. It was never approved and finalized as required in the Programmatic Regulations, which would have allowed aggrieved parties to challenge the memorandum when it was issued. Instead, the Corps has left it in draft form for sixteen years while nevertheless following it in connection with CERP projects. The Corps also never stated when it adopted LORS 2008 that it would permanently change the water supply baseline under the Savings Clause for future CERP projects, *see generally* J.A. 1103, which would have alerted stakeholders that it was more than a temporary change to management of Lake Okeechobee and that they should consider challenging it.

The logic of the guidance memorandum also runs counter to the structure of WRDA 2000. In WRDA 2000, Congress approved the CERP as a "comprehensive plan" to serve as the "framework for modifications and operational changes to the Central and Southern Florida Project." WRDA 2000 § 601(b)(1)(A). A plan is "comprehensive" if it covers everything, *see* Webster's Ninth New Collegiate

Dictionary 270 (9th ed. 1989) (defining "comprehensive" as "covering completely or broadly"), and something is a "framework" if it provides overall policy direction, *see id.* at 489 (defining "framework" as "a basic structure (as of ideas)").  Congress also directed the Corps to "integrate" that plan with preexisting authorized projects. WRDA § 601(b)(1)(B).  "Integrate" means to bring together into a single whole.  *See id.* at 628 (defining "integrate" as "to form, coordinate, or blend into a functioning or unified whole").  This language indicates that nothing is excluded from the comprehensive framework.

Unsurprisingly, when the Corps described the Savings Clause around the time of WRDA 2000, it did not exclude any Corps actions from its assurances.  When the Corps presented the CERP to Congress for authorization in 1999, it described the "principle" behind the Savings Clause as:  "[p]hysical and operational modifications to the C&SF Project by the Federal government or the SFWMD will not interfere with existing legal uses and will not adversely impact existing levels of service for … water supply…."  J.A. 1025.  The Corps cited similar broad language as the Congressional "intent" for the Savings Clause when it promulgated the Programmatic Regulations in 2003: "[e]limination of existing sources of water supply is barred until new sources of comparable quantity and quality of water are available."  Programmatic Regulations Final Rule, 68 Fed. Reg. at 64215 (quoting Senate Report No. 106-362).  It was not until four years after the regulations were

finalized that the Corps stated that it could exclude some of its own intervening actions from the assurances provided by the Savings Clause.

The draft guidance is also inconsistent with the purpose of CERP to "vastly increase water storage and water supply for the natural system as well as for urban and agricultural needs." J.A. 993; J.A. 1007-1008; J.A. 1012; Programmatic Regulations Final Rule, 68 Fed. Reg. 64200; J.A. 743 (including "increase storage and water supply for the natural system, as well as for urban and agricultural needs" in the description of "Goals and Purposes of the Plan").  By exempting Corps activities that the agency labels as "intervening non-CERP activities," the guidance memorandum allows the Corps to *decrease* overall water storage and water supply provided by the Central and Southern Florida Project.  Instead of growing the water pie, the guidance memorandum essentially allows the Corps to redivide the pie by exempting certain activities from the requirements of the Savings Clause so that the water can be transferred without restrictions from agricultural and urban users to the natural system.

While the Corps is not required to make up losses in water supply caused by natural events or the actions of third parties, it makes little sense that the Corps can simply declare that *some of its own actions*, especially those that dramatically affect one of the primary project purposes of water supply such as changes to Lake Okeechobee regulation schedules, are not subject to WRDA 2000.  This is especially

troubling in a case such as this, where the issue is not whether the Corps may act to adjust water levels on a temporary basis to facilitate repairs to the Herbert Hoover Dike, but rather whether the Corps can ignore the effects of those actions when it approves a CERP project years later.

### 2. The District Court Order Erred in Concluding that the Corps Need Not Use the Pre-CERP Baseline in its Analysis of the EAA Project

The district court erroneously determined that the Corps need not have used the pre-CERP baseline in its Savings Clause analysis for the EAA Project. First, the Order misidentified the central issue in the case. Okeelanta's complaint challenges the Corps' approval of the EAA Project in 2020 and the agency's analysis of the water supply effects of EAA Project pursuant to the Savings Clause. The Order, on the other hand, focuses on whether the Corps had to follow the Savings Clause in 2008 when it adopted LORS. The Order states that the case "boils down to two questions[:] … is there such a thing as an 'intervening non-CERP activity' [and] … was LORS 2008 an intervening non-CERP activity[.]" Doc. 76 at 14, J.A. 1399. Most of the Order addresses the Corps' authority to manage water in Lake Okeechobee, opines that the Corps did not violate the Savings Clause when it adopted LORS in 2008 because such a conclusion "cannot possibly be right[,]" *id.* at 27, J.A. 1412, and even offers advice to the Corps on "future changes to the Lake Okeechobee Regulation Schedule," finding that "the Corps may treat the water

elevation set by LORS 2008 as a permissible baseline," *id.* at 15, J.A. 1400.  The Order goes so far as to criticize the Plaintiffs for not filing a lawsuit against the Corps challenging LORS.  *Id.* at 21, J.A. 1406.  All of this misses the actual claims in the case, which are about the Corps' approval of the EAA Project, not the Corps' approval of LORS in 2008 or the Corps' future approval of a new regulation schedule for Lake Okeechobee when LORS expires.  Whether the Corps should have applied the Savings Clause when it adopted LORS in 2008 is not at issue in this case; the issue is whether the adoption of LORS years ago allows the Corps to reset the water supply baseline when it evaluated future CERP projects.

Second, the Order simply assumes that if LORS was a non-CERP activity, then it "changed the baseline" for Savings Clause analysis for *future CERP projects* such as the EAA Project.  Doc. 76 at 3, 15, 31-32, J.A. 1388, 1400, 1416-1417.  Whether or not the Corps properly applied the Savings Clause rules in 2008 when it adopted LORS does not change those rules for future projects.    The Order acknowledges that the Corps announced LORS as a temporary regulation schedule that is scheduled to expire in 2023.  *Id.* at 9, 15, 21, J.A. 1394, 1400, 1406.  Yet, there is no explanation why such a temporary schedule – that will not even be in effect when the EAA Project is operational – should change the Savings Clause baseline in the analysis of the EAA Project.

Third, the Order does not explain how the Corps' adoption of LORS could change the language in the Programmatic Regulations. The Corps' legal obligations are established by the statute and its regulations, not by Corps' own prior conduct. The adoption of LORS, in administrative law terms, was an informal adjudication, not a rulemaking, because it constituted a decision regarding a specific matter. 5 U.S.C. § 551(7) (defining "adjudication" as an "agency process for formulation of an order"), § 551(6) (defining "order" as a "final disposition … of an agency in a matter other than a rule making"). The Savings Clause identifies the baseline as the water "available on the date of enactment of this Act" (December 11, 2000). The Programmatic Regulations provide that the Corps must determine "if implementation of the project will cause an elimination or transfer of existing legal sources of water by comparing the availability of water with the recommended project with the pre-CERP baseline," 33 C.F.R. 385.36(a), and defines the "pre-CERP baseline" as "the hydrologic conditions … on the date of enactment of WRDA 2000," *id.* § 385.3. That is what the statute and regulations require, and until Congress amends the statute and the Corps revises its regulation, they apply today regardless of whether the Corps did not apply them in the past.

Fourth, the Order misconstrues section 385.36(a). As noted above, that regulation provides that "[t]he Corps … shall determine if implementation of the project will cause an elimination or transfer of existing legal sources of water by

comparing the availability of water with the recommended project with the pre-CERP baseline…."  In its five-sentence dismissal of the regulation, the district court focuses on the phrase "implementation of the project" and states that the "[r]egulations limit the application of the Savings Clause to losses in water due to project implementation," and does not "expand the scope of the Savings Clause to non-CERP activities."  Doc. 76 at 18-19, J.A. 1403-1404.  This discussion appears to erroneously assume that "project implementation" in this context refers to CERP in general, but the regulations define "project" in this context to mean "a component or group of components of the Plan" triggering the Savings Clause analysis, such as the EAA Project here.  33 C.F.R. §§ 385.3, 385.36(a); *see also Dubin v. United States,* 143 S. Ct. 1557, 1566-67 (2023) (construing terms of statute in light of the terms surrounding them).

The Order also glosses over the fact that the key sentence of section 385.36(a) requires a comparison of water supply with the EAA Project to the "pre-CERP baseline," which is defined to include "assumed operations of the Central and Southern Florida Project" in 2000.   33 C.F.R. § 385.3.  Specifying that the Corps must conduct the comparison using operational rules in effect in 2000 means that the Corps cannot assume operational rules adopted at a later date (such as in 2008 when LORS was adopted), which is the purported "intervening non-CERP activity" in this case.  This means that there are no "intervening non-CERP activities" the way

42

section 385.36(a) is written. "[S]tatutory interpretation must 'begi[n] with,' and ultimately heed what a statute actually says." *Groff v. DeJoy,* 143 S. Ct. 2279 (2023) (quoting *National Ass'n of Mfrs. v. Dep't of Defense,* 138 S. Ct. 617, 631 (2018)). The Order states that the definition of "pre-CERP baseline" is not "a smoking gun" because "what matters is a loss in water due to 'project implementation,'" Doc. 76, at 19 n.10, J.A. 1404, but this amounts to rewriting the regulation to take the term "pre-CERP baseline" out.

In a tacit admission that section 385.36(a) means what it says and requires comparison to the pre-CERP baseline, the Order suggests that the regulation should "have no effect" because the Savings Clause "unambiguously does not apply to non-CERP activities." Doc. 76 at 19, J.A. 1404. As discussed above and elsewhere (including in the papers filed by the Sugar Cane Growers Cooperative and U.S. Sugar Corp.), the Order's interpretation of the Savings Clause is incorrect, so the conclusion does not follow. Moreover, with this suggestion the district court overstepped its role because no party asked it to invalidate the regulations. The district court effectively rewrote the regulations instead of requiring the agency to follow the procedures in the Administrative Procedure Act.

Fifth, the Order ignores the hierarchy of regulations and guidance documents, in which regulations establish legal requirements that a guidance memorandum cannot change. An agency cannot follow a guidance that is at odds with its

regulation. *See Simmons v. Block*, 782 F.2d 1545, 1549-50 (11th Cir. 1986). The Order also dismisses the irregularity of the guidance memorandum – such as the failure of the Secretary of the Army to approve it as required by its regulations – and dismisses as inconsequential the Corps' failure to issue a document defining the pre-CERP baseline as required by the regulations. Doc. 76 at 7, J.A. 1392.

(apparently accepting the Corps' explanation for missing the deadline to issue approved guidance memoranda by nineteen years as "the nature of the bureaucratic process"), *id.* at 35 n. 24, J.A. 1420 (stating that failure to develop the pre-CERP baseline is not "significant"). There seemingly is no failure by the Corps that the Order is unwilling to excuse.

Finally, the Order incorrectly applies principles of statutory interpretation. The Order improperly reads out of the Savings Clause the phrase "as that available on the date of the enactment of this Act," because if Lake Okeechobee is a "key component of Florida's water supply," Doc. 76 at 3, J.A. 1388, and LORS permanently changed the water supply baseline for the lake as indicated in the Order, *id.* at 15, 31-32, then the Corps will never do a Savings Clause analysis for any future project using the pre-CERP baseline. The Order also ignores or downplays multiple terms in WRDA 2000 that indicate that CERP generally governs the Corps' changes to the  Central and Southern Florida Project, including the description of the plan as "comprehensive," the provision that CERP is "the framework for modifications and

operational changes" to the C&SF Project, and the requirement that the Corps "integrate" CERP with preexisting projects. All of this violates the principle that all terms in a statute must be given meaning. *Ysleta Del Sur Pueblo v. Texas,* 142 S. Ct. 1929, 1939 (2022) (courts must "normally seek to construe Congress' work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'") (quoting *Corley v. United States,* 556 U.S. 303, 314 (2009)).

The Order's discussion of statutory "history and purpose" erroneously focuses almost entirely on statutes other than WRDA 2000. Doc. 76, at 28-34, J.A. 1413-1419. The Order ignores the history of Congressional authorizations that led Congress to approve WRDA 2000 to create a new comprehensive plan. The Order also spends pages discussing marginally relevant post-WRDA 2000 statutes that the Order admits have "little to-no value in interpreting a statute." Doc. 76 at 32 n. 20, J.A. 1417. None of this reasoning supports ignoring the plain language of the Savings Clause or section 385.36(a).

### C. The Army Corps Violated NEPA and the Savings Clause By Approving the EAA Project Without Analyzing the Effects on Water Supply of Operating the Stormwater Treatment Area for Years Before Completion of the Reservoir

#### 1. The Agency Failed to Analyze the Water Supply Effects of Operating the Stormwater Treatment Area Before Completion of the Reservoir

The Corps violated NEPA when it approved the construction and operation of the EAA Project without analyzing the water supply effects of operating the

stormwater treatment area before completion of the reservoir. The Corps' failure to conduct any kind of Savings Clause analysis for standalone STA operations means that the agency also violated WRDA 2000.

NEPA requires agencies to analyze the reasonably foreseeable environmental effects of their proposed actions. 42 U.S.C. § 4332(2)(C)(i). Agencies do this by preparing an environmental impact statement (EIS) that "take[s] a 'hard look' at potential environmental consequences of their actions." *Center for Biological Diversity v. U.S. Army Corps of Eng'rs,* 941 F.3d 1288, 1293 (11th Cir. 2019) (quoting *Ohio Valley Envt'l Coal. v. Aracoma Coal Co.,* 556 F.3d 177, 191 (4th Cir. 2009), and *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350 (1989)). The purpose of NEPA is to "ensure[] that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 371 (1989) (citing *Robertson,* 490 U.S. at 350). Interdependent parts of a larger action that depend on the larger action for their justification must be analyzed in a single EIS. 40 C.F.R. § 1501.9(e)(1)(iii). After completing its environmental review, agencies must issue a Record of Decision that states the decision and identifies and discusses all factors which were balanced by the agency in making its decision. 40 C.F.R. § 1505.2(a)-(b); *Defenders of Wildlife v. U.S. Dep't of the Navy,* 733 F.3d 1106, 1109-10 (11th Cir. 2013). Agencies are prohibited from taking actions prior to issuance of the Record of Decision which

46

would "[h]ave an adverse environmental impact … or [l]imit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a). The Corps' Programmatic Regulations require the Corps to include its NEPA reviews with the Project Implementation Report, 33 C.F.R. §§ 385.26(a)(1), (d), and provide that the Assistant Secretary of the Army shall review and approve the report "prior to implementation of the project," *id.* § 385.26(f)(7).

The Corps issued its record of decision approving construction and operation of the EAA Project based on the 2020 Final Environmental Impact Statement, which discussed the water supply effects of only some project operations. Specifically, it looked at the water supply effects of operating the stormwater treatment area and reservoir together once both components are completed and operational. It also looked at the water supply effects of start-up operations of the STA, when the plants in the stormwater treatment area are growing to enable flow-through operations. However, the 2020 FEIS did not consider the water supply effects of interim flow-through operations of the STA, after the grow-in period but for the estimated four plus years before the reservoir is completed.

Flow-through operations of the STA before completion of the reservoir could have significant effects on water supply. The EAA Project is designed to take water stored in Lake Okeechobee, where it currently is available for agricultural and urban users during a drought. J.A. 491. The STA component of the project treats that lake

47

water so that it can be discharged to the Everglades. Once the reservoir is built, some of the water stored in the reservoir can be used for agricultural water supply. Before the reservoir is built, any lake water treated in the STA has to be discharged to the Everglades, which means that it is unavailable for water supply during a drought. Doc. 28-1 ¶ 33, J.A. 121. The amount of water affected is not small: the stormwater treatment area is designed to treat up to 162,000 acre-feet of water a year, J.A. 515, and the STA is expected to be capable of flow-through operations at least four years before the reservoir is completed. For that reason, Okeelanta asked the Corps to analyze water supply during these interim operations, J.A. 498, but the agency refused and simply approved the project. J.A. 1102; J.A. 1051.

The Corps plainly violated NEPA when it failed to analyze the water supply effects of flow-through operations of the STA prior to completion of the reservoir. Significant water supply effects are reasonably foreseeable before the reservoir component is completed, but the Corps ignored this issue. *Sierra Club v. Martin,* 510 F.2d 813, 820 (5th Cir. 1975) (one of the primary purposes of NEPA is to prevent "stubborn problems or serious criticism from being swept under the rug"). Despite failing to analyze this issue, the Corps approved both the construction and operation of the overall EAA Project, including the STA component, when it issued its 2020 Record of Decision approving overall civil works project. J.A. 489. The Corps also entered into a Project Partnership Agreement with the SFWMD based on

the 2020 FEIS which entitled the SFWMD to receive credit toward its cost share for the hundreds of millions of dollars being spent on the STA.  J.A. 712.  In so doing, it made irretrievable commitments of resources, and made possible the expenditure of hundreds of millions of dollars by the state and federal governments.

The Corps was required to analyze this issue before approving the overall project.  The Programmatic Regulations provide that the Project Implementation Report must be completed before the Assistant Secretary of the Army approves a project.  33 C.F.R. § 385.26(f)(7).  The Project Implementation Report must include both the NEPA analysis and the Savings Clause analysis.  *Id.* § 385.26(a)(3)(x), (d). This sequence of analyzing issues first before making decisions is consistent with the purpose of NEPA, which is to make agencies aware of the consequences of their actions before they make decisions.  *Robertson,* 490 U.S. at 349.  That is why the NEPA regulations prohibit agencies from taking actions until 30 days after notice of availability of a final EIS is published in the Federal Register.  40 C.F.R. §§ 1506.10(b), 1506.11(b)(2).

There is little indication in the administrative record that the Corps intended to conduct additional NEPA analysis after issuance of the Record of Decision in 2020.  The 2020 FEIS does not indicate that the Corps was deferring any of its NEPA review related to the STA.  *See* J.A. 496 ("this Final EIS is a comprehensive environmental analysis of the permit application for the STA project").  The FEIS

49

only stated that if changes were made to the project, then "such modifications would be analyzed under supplemental NEPA reviews at their respective proposal stage." J.A. 497.  The May 2020 Record of Decision approved the EAA Project based on the 2020 FEIS, and stated that "[t]his Record of Decision completes the National Environmental Policy Act process."  J.A. 494.

The Corps' Clean Water Act Section 404 permit, which was issued to authorize construction of portions of the stormwater treatment area in the waters of the United States, included a condition prohibiting STA operations "beyond what is described in the project description until written authorization is granted by the Corps."  J.A. 456.  The Record of Decision for this permit described the rationale for this condition as "[t]he draft operating plan that was included in the Final EIS did not have enough details to ensure that adequate NEPA evaluation was completed," so the NEPA analysis "will be updated to reflect the operations plan and coordinated for public and agency review as appropriate."  *Id.*  The SFWMD submitted the operations plan in November 2020.  J.A. 548 (ROD describing it). The Corps acknowledged that submission of the operations plan would allow "the Corps to update our National Environmental Policy Act (NEPA) analysis," *id.*, but the administrative record reveals that the Corps never did any such updated analysis. Instead, the agency indicated in March 2021 that it was poised to approve STA

50

operations, and the only reason why it was not doing so was because it was waiting for the issuance of a water quality certification by the State of Florida. *Id.*

The administrative record makes clear that the Corps had no plan to conduct additional NEPA analysis before Okeelanta and the other appellants filed their lawsuits. However, if, in fact, the Corps always intended to delay its NEPA analysis of standalone STA operations until a later date, then that would be improper segmentation of its review. The NEPA regulations provide that "[p]roposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement." 40 C.F.R. § 1502.4(a); *see also id.* § 1501.9(e)(1)(iii) ("connected actions" to be discussed in a single EIS include actions that "[a]re interdependent parts of a larger action and depend on the larger action for their justification"). Operation of the STA prior to completion of the reservoir is simply one stage of a single project. Nowhere in the administrative record does the Corps ever describe the STA and reservoir to be separate projects; to the contrary, the Corps refers to them as "components" of the EAA Project. *E.g.,* J.A. 842-847. The 2020 FEIS analyzed construction of the STA and reservoir, the initial vegetation grow-in operations of the STA, and flow-through operation of the STA once the reservoir is completed. J.A. 867-869; J.A. 903-905. Deferring analysis of an intermediate stage of STA operations – flow-through operations before completion of the reservoir – to a later EIS would violate those

51

regulations. *Delaware Riverkeeper Network v. FERC,* 753 F.3d 1304, 1308-09 (D.C. Cir. 2014) (agency violated NEPA by preparing separate environmental assessments for parts of connected, closely related and interdependent projects); *cf. Kleppe v. Sierra Club,* 427 U.S. 390, 410 (1976) ("when several proposals … that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together").

### 2. The District Court Order Erred in Concluding that a Promise During Oral Argument to Conduct Future Analysis Cured the NEPA Violation

The Order acknowledges that the Corps' NEPA analysis assumed that the stormwater treatment area would only operate in tandem with the reservoir. Doc. 76 at 36, J.A. 1421. The Order also acknowledges that the STA will be ready for flow-through operations in 2025 while the reservoir is not expected to be completed until at least 2029, if not later. *Id.* Yet, the Order found no violation because the Corps' Clean Water Act Section 404 permit, authorizing construction of the STA, prohibits operations until a further approval by the Corps, and agency counsel at oral argument committed the agency to doing further NEPA and Savings Clause analysis before that approval is given. Doc. 76 at 36-38, J.A. 1421-1423. The Order therefore entered summary judgment for the Corps because of "the broad discretion that agencies are given as to when they perform a NEPA analysis." *Id.* at 38, J.A. 1423.

52

The Order provided no explanation as to why it denied the Savings Clause claim.  Even if agencies have flexibility of timing of their NEPA analyses (discussed below), there is nothing in WRDA 2000 or the Programmatic Regulations that says that the Corps can delay a Savings Clause analysis until after it approves a project.  To the contrary, the Programmatic Regulations require the Savings Clause analysis to be part of the Project Implementation Report, 33 C.F.R. § 385.36(a), which is the document which provides the "information and analysis necessary for the Secretary of the Army to approve the project for implementation," *id.* § 385.26(a)(i).

Regarding NEPA, the Order is incorrect that the NEPA analysis is not overdue.  First, the Order ignores that the Assistant Secretary of the Army approved the overall EAA Project in the May 2020 Record of Decision.  That decision triggered the expenditure of hundreds of millions of dollars by the Corps and SFWMD, and made implementation of the project a fait accompli.  Even if the Clean Water Act Section 404 permit delayed approval of STA operations, the overall project approval represents an irretrievable commitment of resources without full consideration of the water supply effects of operating the stormwater treatment area for years before the reservoir is completed.

Second, the Order ignores the requirement of the Programmatic Regulations that the Corps include its NEPA analysis in an approved Project Implementation Report "prior to implementation of the project."  33 C.F.R. § 385.26(f)(7)(i).  This

places a deadline on the Corps to complete its NEPA analysis that is specific to CERP projects.

The cases cited in the Order for the proposition that agencies have "broad discretion … as to when they perform NEPA analysis," Doc. 76 at 38, do not address CERP projects and do not stand for the proposition that agencies can wait until after a project is approved to conduct NEPA. Instead, those cases address whether an agency must prepare NEPA documents for projects that have not yet been proposed. *See Kleppe,* 427 U.S. at 412 (holding that NEPA does not require analysis of projects that have not been proposed, and that agency has some flexibility regarding the geographic scope of analysis of specific proposals); *City of Oxford, Ga. v. F.A.A.,* 428 F.3d 1346, 1354-56 (11th Cir. 2005) (in NEPA document addressing the effects of changes to airport runways, the agency was not required to analyze the construction of a new terminal building that had not been specifically proposed). Neither of these cases stand for the proposition that an agency can wait to conduct a NEPA analysis of a component of a proposed project until after the project is approved.

Finally, the Order appears to confuse the question of whether the Corps violated NEPA and the Savings Clause with the appropriate remedy for the violation. The Corps should have analyzed standalone STA operations before approving the project, and its failure to do so violated NEPA. The Corps obviously needs to

remedy its violation, and agency counsel committed the Corps to conducting additional NEPA analysis at oral argument in district court. However, the Order appears to miss the point that the agency's remedy does not expunge the original violation, because the district court granted summary judgment to the Corps.

## **CONCLUSION**

The Corps violated the WRDA 2000 Savings Clause and its implementing Programmatic Regulations when it failed to compare water supply available with the EAA Project to water supply available under the pre-CERP baseline. The Corps also violated NEPA and the Savings Clause when it failed to analyze the water supply effects of STA flow-through operations for the multiple years before completion of the reservoir. The Court should reverse the district court Order and enter judgment for Appellants.

Dated:  November 28, 2023        Respectfully submitted,

*/s/  T. Neal McAliley*
T. Neal McAliley
Florida Bar No. 172091
David A. Karp
Florida Bar No. 69926
CARLTON FIELDS, P.A.
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
(305) 530-0050
nmcaliley@carltonfields.com
dkarp@carltonfields.com

*Counsel for Plaintiff-Appellant*
*Okeelanta Corporation*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned attorney certifies that this Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this response contains 12,482 words, excluding parts exempted by Fed. R. App. P. 32(f), and the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Times New Roman 14-point font, a proportionally spaced typeface using Microsoft Word.

*/s/  T. Neal McAliley*

57

## **CERTIFICATE OF SERVICE**

I certify that on November 28, 2023, I caused the foregoing to be served via

the CM/ECF system on counsel of record:

Gary V. Perko
Gary K. Hunter
Mohammad O. Jazil
HOLTZMAN VOGEL BARAN
  TORCHINSKY & JOSEFIAK, PLLC
19 South Monroe Street, Suite 500
Tallahassee, Florida 32301
850-270-5938
gperko@holtzmanvogel.com
ghunter@holtzmanvogel.com
mjazil@holtzmanvogel.com
*Counsel for Sugar Cane Growers*
*Cooperative of Florida*

Deborah K. Madden
Luna E. Phillips
GUNSTER, YOAKLEY & STEWART P.A.
450 East Las Olas Blvd., Suite 1400
Fort Lauderdale, Florida 33301
dmadden@gunster.com
mmcleod@gunster.com
lphillips@gunster.com
954-462-2000
*Counsel for U.S. Sugar Corp.*

Gregory M. Munson
GUNSTER, YOAKLEY & STEWART P.A.
215 South Monroe Street, Suite 601
Tallahassee, Florida 32301
gmunson@gunster.com
mmcleod@gunster.com
rfrazier@gunster.com
850-521-1980
*Counsel for U.S. Sugar Corp.*

Paul D. Clement
Andrew C. Lawrence
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, Virginia 22314
paul.clement@clementmurphy.com
andrew.lawrence@clementmurphy.com
202-742-8900
*Counsel for U.S. Sugar Corp.*

Timothy S. Bishop
Avi M. Kupfer
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
tbishop@mayerbrown.com
akupfer@mayerbrown.com
312-706-8607
*Counsel for U.S. Sugar Corp.*

Peter Kryn Dykema
Sally J. Sullivan
U.S. DEPARTMENT OF JUSTICE
150 M Street NE, Suite 3.142
Washington, DC 20002
202-514-9269
peter.dykema@usdoj.gov
sally.sullivan@usdoj.gov
*Counsel for U.S. Army Corps of
Engineers*

Arielle Mourrain Jeffries
Allen M. Brabender
U.S. DEPARTMENT OF JUSTICE
P.O. Box 7415
Washington, DC 20044
202-532-3140
arielle.jeffries@usdoj.gov
allen.brabender@usdoj.gov
*Counsel for U.S. Army Corps of
Engineers*

Matthew J. Feeley
U.S. ATTORNEY'S OFFICE,
SOUTHERN DISTRICT OF FLORIDA
99 N.E. 4th Street, Suite 300
Miami, Florida 33132
305-961-9235
Matthew.Feeley@usdoj.gov
*Counsel for U.S. Army Corps of
Engineers*

*/s/  T. Neal McAliley*

134569501

59